15

[If you need additional space for ANY section, please attach an additional sheet and reference that section]

**RECEIVED**

MAY 1 0 2019 *PB*

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

Morris Tyson

Plaintiff(s),

v. Mars Inc el at All

Defendant(s). Mars Inc.,
Evel, Kenco Logistics

)
)
)
)
)
)
)
)
)
)
)
)
)
)

1:19-cv-03193
Judge Sharon Johnson Coleman
Magistrate Judge Jeffrey T. Gilbert

## COMPLAINT OF EMPLOYMENT DISCRIMINATION

1. This is an action for employment discrimination.

2. The plaintiff is  Morris Tyson  of the
county of  Cook  in the state of  IL.  .

3. The defendant is  Mars Inc at All  , whose
street address is  208 S. LaSalle St. Suite 814  ,
(city) Chicago (county) Cook  (state) IL.  (ZIP) 60604

(Defendant's telephone number)  (___) – _____

4. The plaintiff sought employment or was employed by the defendant at (street address)
 Mars Manteno Co.  (city) Manteno 
(county) Kankakee (state) IL.  (ZIP code) 60901

[If you need additional space for ANY section, please attach an additional sheet and reference that section.]

Rev. 06/27/2016

# Other Defendant's

Robert Coffey

Todd Moore

Kelvin Walsh

Mario Lopez

David Jabaley

Mike Manzello

Jay Elliott

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

1.    No administrative prerequisites are required before a plaintiff files a complaint pursuant to the Civil Rights Act of 1866, as amended by the Civil Rights Act of 1991, 42 U.S.C. §1981.

## FACTUAL ALLEGATIONS

2.    TYSON was employed at the MARS, Inc.-Mars Manteno warehouse beginning on or about January 19, 2004 as a Spotter until May 13, 2015.

3.    Various 3rd party logistics management companies managed the Mars Manteno facility whom at all times acted as agents of MARS, Inc. beginning with 4T's Management Company in 1999, KENCO Logistics in April of 2013 and Exel in March of 2015 at the Mars' warehouse in Manteno, Illinois.

4.    At all relevant times, Defendants MARS, KENCO and Exel employed in excess of fifteen (15) employees for at least twenty (20) calendar weeks in 2013, 2014 and 2015.

5.    At all relevant times, all matters regarding compensation, terms, conditions, rights and privileges of TYSON's employment were governed and controlled by Defendant MARS and their agents 4T's, KENCO and Exel.

6. At all relevant times TYSON possessed the skills, experience and qualifications necessary to work in his employment position and adequately and completely performed all of the functions, duties and responsibilities of his employment with Defendant MARS and its agents 4T's, KENCO and Exel.

7. 4T's, KENCO and Exel were acting as the agents of MARS and in their conduct and actions as alleged herein were acting in a capacity within the scope of its authority, or, if said conduct was outside the scope of its authority, said conduct was known; authorized and ratified by MARS.

8. Plaintiff filed charges of discrimination based upon race, disparate: 1) treatment, 2) impact and 3) pay, hostile work environment, failure to accommodate and disability amongst other issues dually at the Illinois Department of Human Rights herein after "IDHR" and the Equal Employment Opportunity Commission herein after "EEOC" beginning in September of 2014 through April of 2015.

9. By the beginning of May of 2015, the Defendants MARS, KENCO and Exel had received Plaintiff's formal charges of discrimination dually filed at the IDHR and EEOC at the MARS, Inc. Manteno facility by mail.

10. Plaintiff was terminated on May 13, 2015 for allegedly not being physically able to drive a reach truck or lift. Exhibit 1

11. Driving a reach truck was not a requisite or requirement of Plaintiff's job as a "Spotter."

12. Spotters moved the tractor trailers within the yard and offsite that were loaded by warehouse workers after the product had been pulled and staged by other warehouse workers.

2

13. Spotters were required to have Commercial Driver's Licenses herein after "CDL."

14. Spotters did not load trucks, pull or stage product at the MARS Manteno facility as part of their specified duties as a Spotter.

15. Specifically, each job had a job description that was developed from a job analysis according to Defendants policy. Exhibit 2

16. There are industry norms set by the Society of Human Resources Management herein "SHRM" on job analysis. Exhibit 3

17. Exel is a DHL Express company that engages in supply chain management.

18. Exel was hired to manage the MARS Manteno facility.

19. Exel began managing the Mars Manteno warehouse in March of 2015, after Kenco Logistics management contract was unexpectedly terminated prematurely by MARS, Inc. in January of 2015.

20. Exel was a privately held company in Westerville, Ohio.

21. In January of 2016 Exel changed its name to DHL Supply Chain: North America.

22. DHL Supply Chain: North America is a privately held company in Plantation, FL 33324

23. Kenco Logistics is a 3rd party logistics company that manages warehouse and distribution centers for other companies.

24. Kenco Logistics stated to the Illinois Department of Human Rights and EEOC in its Position Statement beginning on or about November 2014 in case number 2014CF0475, and subse-

3

quently again in case number 2014CF2858, 2014CF2992, 2014CF3057, 2014CF3161, 2015CF0310, 2015CF0811, 2015CF1145, 2015CF0342, 2015CF0990, 2015CF1315, 2015CA1464, 2014CF3162, 2015CF0003, 2015CF0006, 2015CF0515, 2015CF0516, 2051CF0699, 2015CA1054, 2015CA1590 and others that "Kenco is a third-party logistics company ("3PL") that operates and manages warehouses and order fulfillment operations for other companies."

25.    On April 21, 2013, Kenco began managing such a warehouse in Manteno, Illinois for Mars, Inc.

26.    Kenco Logistics is a privately held company in the state of Tennessee.

27.    Kenco Logistics is part of the Kenco Group.

28.    Kenco Group President and COO David Caines.

29.    Kenco Logistics was hired to manage the Mars, Inc. Manteno facility in Manteno, IL.

30.    Mars, Inc. is a privately held company in Virginia.

31.    Mars, Inc. paid its management companies including 4T's, Kenco and Exel a management fee to manage the Mars Manteno facility.

32.    MARS, Inc. passed thru their costs through its management companies including 4T's, Kenco and Exel with the exception of the lease, taxes, fire protection, insurance, rack expense/amortization, management fee, material handling fee were direct pays by MARS, Inc. to the creditors.

4

33.   Specifically, Mars, Inc. passed thru its management companies including 4T's, Kenco and Exel the salaries of all the employees (temporary and part & full time employees), as well as, any invoices of the Mars Manteno facility.

34.   Plaintiff asserts that this same structure was in place for Exel, as MARS, Inc. controlled and approved the budget for the Mars Manteno facility.

35.   Specifically, Mars, Inc. has at one time or another leased or had part ownership in the Mars Manteno facility and/or had an interest in this building since 1999.

36.   Defendant MARS, Inc. managed its management companies inclusive of 4T's, Kenco and Exel at the Mars Manteno facility along with other management companies in the MARS, Inc. network of distribution centers.

37.   Specifically. Mars, Inc. would provide daily guidance to the Mars, Manteno facility.

      a.     On site Regional District Manager herein after the "RDM."

      b.     Morning meetings regarding the daily "Plan."

      c.     Fulfillment orders generated by MARS, Inc. through the WMS-SAP.

      d.     MARS, Inc. warehouse quality manual.

      e.     Cross-functional collaboration between departments.

      f.     Employee incentives.

38.   Mars Manteno was a part of the network of Mars distribution centers.

39.   Mars Manteno was the Midwest distribution center

Mars Manteno serviced twelve (12) Midwestern states and Canada

40. Mars Manteno was infrastructually similarly situated to the other four (4) distribution centers in the network in organization. For example, but not limited to having a:

    a.    General Manager

    b.    Operations Manger

    c.    Accounting/Human Resources

41. Organizationally the Mars Manteno General Manager answered to and conferred with the onsite RDM of Mars, Inc., as a matter of the course of ordinary business operations.

42. *Black's Law Dictionary* defines "employee" as "a person in the service of another under any contract of hire, express or implied, oral or written, where the employer has the power or right to control and direct the employee in the material details of how the work is to be performed.

43. Mars, Inc. provided and stipulated such terms and conditions of employment, to its management companies including 4T's, Kenco and Exel, as well as, compliance; specifically with the Mandates of Mars outlined in the **Mars US Warehouse Quality Manual** and public policy, including but not limited to FSMA (Food safety and Modernization Act, 2001 Bioterrorism Act, CFR Title 21, and any other applicable public policy, just as it would with any employee and as it had done with the previous Management Companies at the Mars Manteno Facility and its various other warehouse.

44. Mars, Inc. required its management companies including 4T's, Kenco and Exel be compliant with Public Policy, as it relates to the codified laws of the land, just as it would with any employee.

45. Specifically, Mars, Inc. provided its management companies 4T's, Kenco and Exel with company policies, procedures, manuals and the like, just as it would with any employee.

46.  In addition, Mars, Inc. provided the necessary tools to perform the assigned job functions, such as but not limited to: Leasing the facility, the equipment (warehouse and office), the computers, the software, as well as, the maintenance, upkeep and repairs of such, just as it would for any employee.

47.  Specifically, Mars, Inc. provided to Kenco Logistics, just as it had its former management company and its successor Exel on a regular and ongoing basis, a comprehensive standard to safeguard the Quality and Food Safety of its products in the outbound pipeline. The document was developed in conjunction with Global Quality and Food Safety Requirements and the Food Safety and Modernization ACT.

48.  Specifically, Mars, Inc. set the performance management standards and goals for its management companies 4T's, Kenco and Exel, just as it would with any employee, including the RDM-Robert Coffey.

49.  Kenco Logistics and Exel because of their multifunctional and multilayers of management types can be coined as a "Super Manager."

50.  Specifically, Mars, Inc. provided its "Super Managers" with ongoing guidance, support and management continually.

51.  Specifically, Mars, Inc. provided this support, guidance and management to its "Super Managers" of the Mars Manteno Facility, by way of an in-house Regional Distribution Manager (RDM).

52.    Kenco Logistics and Exel, Defendant MARS, Inc. "Super Manager" just as any employee would, on an ongoing regular and regimented basis conferred with, Mars, Inc. for directives and goals, while conforming to these directives, and reporting the results of such to Mars, Inc.

53.    Just as any manager would, Defendants Exel and Kenco Logistics a type of "Super Manager" dovetailed their management styles to synergize the mandates of it employer, Mars, Inc. and public policy to meet the performance management goals set by Mars, Inc.

54.    Public policy drives industry standards that drive company policy.  Specifically, in this case the Food, Drug and Cosmetic Act (FD&C Act), Food Safety and Modernization Act (FSMA), 2001 Bioterrorism Act and other acts, as well as, The World Health Organization (WHO), Codex Alimentarius, FAO and other organizations, shape and form the various  recognized Global Food Safety Initiative (GFSI) benchmarks; which include but are not  limited to: FSSC 2200, ISO2200, BRC, IFS, SQF and other food safety standards.

55.    Specifically, Kenco Logistics was assigned the task of implementing a written Quality Management System based upon the current non-documented procedures and protocols being performed at the Mars Manteno facility. This standard was based upon ISO, the International Standard of Organization.

56.    Kenco Logistics Quality Management System is based on an ISO, the International Standard of Organization; the specific ISO standard is 9001:2008.

57.    Specifically, Kenco Logistics implemented a written Quality Management System at the Mars Manteno Facility.

58. The Quality Management System at the Mars Manteno Facility consisted of standard operating procedures, best practices, policies, procedures, and protocols according to Defendants policies including CP-BP-4.2.1.001.

59. MARS, Inc. required Kenco to turn over this written library of standard operating procedures, best practices, policies, procedures, and protocols when MARS, Inc. terminated its business relationship with Kenco.

60. Mars, Inc. and Kenco Logistics are both certified to some Global Food Safety Initiative standard and or benchmark.

61. Yearly external audits are required to remain compliant to the Quality Management System, along with internal audits.

62. Furthermore, the Federal Government under the 2001 Bioterrorism Act and the 2011 Food Safety Modernization Act, require all august body participants along the food supply chain to be complaint; Essentially from farm to fork.

63. This would include Exel MARS' newest management company of the Mars Manteno Facility.

64. Kenco Logistics publicly purports to "ensure all requirements are documented according to the ISO-9001:2008 structure and are incorporated into the sites' standard operating procedures. Through regular internal audits and program development, Kenco's quality team provides support and industry expertise in FDA, OSHA, EPA, DEA, DOT, and numerous other compliance agencies."

65.   Specifically, the system implemented at the Mars Manteno facility was to be a standardization of all policies, procedures, mandates and the like.  This included, but was not limited to job analysis, job descriptions and the corresponding operating procedures for each job.  These and all-encompassing documents are authored and vetted.

66.   All Quality Management systems, including but not limited to this Mars Manteno  Quality Management System, mandate that all documents are to be catalogued, controlled, maintained, and stored amongst other requirements.

67.   Kenco Logistics developed an Appendix A for the Mars Manteno Facility that catalogued the corresponding standardized documents for the Mars Manteno Facility.  This     included but was not limited to Job descriptions, Standard Operating Procedures, policies, and forms.

68.   Kenco Logistics also maintained an Appendix F, a higher matrix of Appendix A, top tier documents, that catalogued the corresponding standardized documents for the Kenco Logistics as a whole, inclusive of the Manteno Facility, as well as, other managed facilities.  This included but was not limited to Job functions by titles, Standard Operating Procedures,     policies, forms and the like.

69.   The documents itemized in Appendix A for the site super ruled those documents in     Appendix F because they were customized to the specific employer's and site requirements.

70.   To ensure proper dissemination and training, each policy and or procedure are to be signed off by each employee and a record retained of such.

71.   No deviation from any policy, procedure, protocol or form is to occur, without following the procedure of the exception procedure and an approval of such on any level.

72. Plaintiff asserts that MARS, Inc. provided Exel with the library of standard operating procedures, best practices, policies, procedures, and protocols it retrieved from Defendant Kenco.

73. President, David Caines, of the Kenco Group referred to the employees of the Mars Manteno site specifically as Mars, Inc. employees. Exhibit 4

74. The "Super Manager's" role was to manage and enforce the directives and mandates of Mars, Inc. at the Mars Manteno facility that was owned, leased and operated by Mars, Inc. since the Mars, Inc. Manteno inception in 1999.

75. The means test for an employee is based upon the Common-law test, the Economic realities test, and the Hybrid test and the results.

76. Kenco, Mars, Inc., "Super Manager" provided back office support to the accounting and human resource department, as well as, the implantation of Kenco management styles, including but not limited to: Kenco Quality Management System (KQMS), an ISO 9001:2008 based system, Operational Excellence and Continuous Improvement based upon Lean and Six Sigma principles.

77. The specific back office support provided by Kenco entailed pass on the invoices/bills of the Mars Manteno facility to Mars, Inc. after they were receipted, reconciled and the like the Mars Manteno Facility Accounting Department.

78. In addition to the invoice pass thru to Mars, Inc., Kenco also passed thru the Mars Manteno payroll by issuing the payroll checks, after the payroll had been processed, verified and submitted by the Mars Manteno Accounting Department for the five (5) different payrolls that comprised the Mars Manteno Facility to Kenco's payroll department.

79.   The additional specific back office support provided by Kenco was the recruitment and hiring of salaried personnel for the Mars Manteno facility, as well as, other Human Resource support. Exhibit 5

80.   The KQMS style was to standardize the facility to bring compliance to 21CFR110, Food Safety and Modernization Act, 2002 Bioterrorism Act, as well as, any other applicable Global Food Safety Initiative (**GFSI**) benchmarked schemes; in addition to, streamlining business process, increase efficiency, profitability and accountability.

81.   The claims of disparate and disparate treatment and impact were reported to the site Human Resource Personnel-Edith McCurry and Leonard Szplett, Kelvin Walsh-General Manager, Mike Manzello Operations Manager, Mario Lopez-General Manager and other corporate persons, by email, phone, and in-person on numerous occasions.

82.   Specifically these claims were made beginning in August 2013-December 2014.

83.   At all times, Robert Coffey, ("Coffey"), a White, American male, held the position of Regional Distribution Manager; managing the Mars Manteno facility including co-pack operations managed by Jacobson and the warehouse and distribution operation managed by Kenco. Coffey was in a position of authority to undertake tangible employment decisions and/or control the terms and conditions of TYSON's employment with Defendants KENCO and MARS.

84.   At all relevant times, Coffey, acted on behalf of Mars, Inc. Coffey managed and approved operational activities of the Mars Manteno facility, including but not limited to: hiring, pay, scheduling, performance management, budgets and workflow amongst other things.

85. At all times, Todd Moore, ("Moore"), a White, American male, held the position of Senior Manager of Logistics for Mars, Inc. Moore was Coffey's boss and was in a position of authority to undertake tangible employment decisions and/or control the terms and conditions of TYSON's employment with Defendants KENCO and MARS.

86. At all relevant times, Moore, acted on behalf of Mars, Inc. Moore managed directed and approved operational activities, including but not limited to: hiring, pay, scheduling, performance management, budgeting and workflow amongst other duties and tasks.

87. At all times, David Jabaley, ("Jabaley"), a White, American male, held the position of Director of Operations and was the acting General Manager of the Mars Manteno facility beginning in June of 2014. Jabaley was in a position of authority to undertake tangible employment decisions and/or control the terms and conditions of TYSON's employment with Defendants KENCO and MARS.

88. At all relevant times, Jabaley, acted on behalf of KENCO Corporate the managing agent for Mars, Inc. and Mars, Inc. Jabaley directed and approved all operational activities, including but not limited to: hiring, pay, scheduling, performance management, workflow and the like.

89. At all times, Kelvin Walsh, ("Walsh"), a White, American male, held the position of General Manager of the Mars Manteno facility from 2012 to 2014. Walsh was in a position of authority to undertake tangible employment decisions and/or control the terms and conditions of TYSON's employment with Defendants KENCO and MARS.

90. At all relevant times, Walsh, acted on behalf of Defendants KENCO the managing agent for Mars, Inc. and Mars, Inc. Walsh directed and approved all operational activities, including but not limited to: hiring, pay, scheduling, performance management, workflow and the like.

91.   At all times, Mario Lopez, ("Lopez"), a White, American male, held the position of General Manager at the Mars Manteno facility from September 2, 2014 until February 2015.  Lopez was in a position of authority to undertake tangible employment decisions and/or control the terms and conditions of TYSON's employment with Defendants KENCO and Mars, Inc.

92.   At all relevant times, Lopez, acted on behalf of KENCO the managing agent for Mars, Inc. and Mars, Inc.  Lopez directed and approved all operational activities, including but not limited to: hiring, pay, scheduling, performance management, workflow and the like.

93.   At all times relevant, Mike Manzello, ("Manzello"), a White male, held the position of Operations Manager, reporting to Walsh, Jabaley and Lopez.  Manzello was in a position of authority to undertake or recommend tangible employment decisions and/or control the terms and conditions of TYSON's employment with KENCO and Mars, Inc.

94.   At all relevant times, Manzello managed operational activities relative to the receipt and distribution of inventory for Mars, Inc., including but not limited to: hiring, scheduling, workflow and the like.

95.   Jay Elliott was the Vice President of Legal for the Kenco Group during the relevant times and resided in Tennessee.

96.   On or about June 2013, TYSON was placed on Family Medical Leave Act due to an injury.

97.   On or about beginning in late July/early August 2013, TYSON repeatedly contacted Walsh, to make himself available for work; TYSON was blatantly ignored and never contacted back regarding returning to work.

14

98. On or about beginning in late July /early August 2013, TYSON repeatedly contacted Len Spzlett-Mars-Manteno Human Resource Manager, in an attempt to make contact with Kelvin Walsh.

99. Szplett indicated that he had been relaying the messages to Walsh.

100. Walsh willfully, intentionally and blatantly did not contact TYSON regarding his return to work.

101. On or about late August 2013, TYSON was denied the opportunity to return to work.

102. TYSON was told by Walsh that he could only come back to work with a full release from the physician.

103. TYSON's restrictions did not interfere with his ability to perform his job as a Spotter.

104. Defendants Kenco and Mars were actively seeking employees to fill open Spotter positions during the time TYSON sought to return to work. Exhibit 6

105. Walsh subjugated TYSON to intentional and willful interference with his employment relationship at the Mars Manteno facility where TYSON had been an employee for over ten (10) years, as well as, intentional infliction of emotional stress and duress, as well as, breaching its fiduciary obligation to TYSON by not returning TYSON to work.

106. There were also other jobs at the Mars Manteno facility that TYSON could have performed that could have accommodated his restrictions, such as a Window Clerk and or a position in sanitation.

107. Maker Baker, a white male, Spotter, with less seniority sustained an injury.

15

108. Baker was hired in June of 2013 and sustained an injury in November of 2013 that left him unable to perform his job duties and responsibilities as a Spotter. Exhibit 7

109. Walsh made accommodations for Baker; Baker was allowed to be a Window Clerk; a function in which TYSON had sufficient skills, knowledge, qualifications and experience to perform the tasks and duties of a Window Clerk.

110. Defendant Kenco stated in its position statement to the IDHR and EEOC in Mardy Ringo's charge no. 2015-CA-15908/21B-2015-00524 that there was one (1) spotter and (1) window clerk per shift.

111. Defendant Mars, Inc. ran a 24 hour seven day a week shift.

112. Defendant stated in another charge before the IDHR and EEOC that there was one window clerk, Brenda Roth.

113. Roth worked the first shift Monday –Friday.

114. According to Defendant's statement of fact, of there being one window clerk and one spotter per shift, there should have been at least one other Window Clerk position available.

115. Consequently, Plaintiff asserts that there were available shifts and days for Plaintiff to work as a window clerk.

116. Defendant changed its position relative to the window clerk position to be relevant to each charge filed in an attempt to intentionally and willfully defraud the process of the administration of justice.

117. TYSON was subjugated to intentional and willful interference of his employment, as well as, intentional infliction of emotional stress and duress, as well as, breaching its fiduciary obliga-

tion to TYSON by not affording TYSON the same opportunity it had Baker, a white male with less seniority and experience.

118. Mark Baker requested to return to work during the same time Plaintiff was requesting to return to work.

119. Baker was not denied to return to work.

120. Plaintiff was effectively denied to return to work in any capacity.

121. Plaintiff had extensive experience as a window clerk, as Plaintiff had performed the window clerk duties in years past.

122. Plaintiff was already trained for the position of Window Clerk.

123. Defendant had to train Mark Baker for the position of Window Clerk.

124. Mark Baker was in an accommodated position of a Window Clerk.

125. In late June 2013 through July 2013 employees from Defendant KENCO's other facilities across the country, as well as, an additional temporary employees were brought in to shore up the workflow gaps.

126. Walsh stated that there was no position available for Plaintiff.

127. Plaintiff inquired with Len Szplett the HR Manager about the next steps in his employment at the Mars Manteno facility.

128. Szplett inquired to corporate on TYSON's behalf what could be done relative to protect TYSON's employment at the Mars Manteno facility. Exhibit 9

129. Defendant Kenco stated that the only accommodation was an extended leave of absence for Plaintiff. Exhibit 9

130. Plaintiff also again provided Defendant with this same partial release in February, March, April and August of 2014.

131. Plaintiff had the same restrictions in his medical releases of February, March, April and August of 2014 as he did beginning in August of 2013 to date.

132. It was not until August of 2014 that Plaintiff discovered that Defendants Kenco and Mars, Inc. were advertising open positions for Spotters and demanded to know why he had not been returned to work.

133. Specifically, sometime in early August of 2014, a sign was posted on the building soliciting help wanted for spotter positions.

134. Plaintiff also asserts that Defendants were making solicitations and actively recruiting for Spotters on Craig's list in July and August of 2014. Exhibit 6

135. On or about Mid-August 2014, Susan Moore, at corporate was contacted about the sign being posted soliciting spotters and why the sign had been posted without contacting TYSON to return to work.

136. TYSON complained to Human Resource Personnel, Susan Moore and her manager at KENCO Corporate about why was he was not called to return to work; stating that they were discriminating against because of his disability and race and that it seemed that if he had not called he would not had an opportunity to be returned to work; despite Defendant KENCO being aware of his clearance and desire to return to work.

137. On or about August 26, 2014, TYSON was returned to work by KENCO Corporate, in his original capacity as a Spotter, with the same restrictions from August of 2013.

138. Defendant Kenco stated to the IDHR and EEOC that TYSON was no longer disabled in their response to the TYSON's formal charges of discrimination.

139. It was at that time that TYSON as sent for a DOT physical.

140. It was at this time that TYSON presented to the independent physician his restrictions that had been in place since August of 2013.

141. TYSON was cleared to return to work as a Spotter without in accommodations being made to the way in which TYSON performed his job as a Spotter.

142. Defendant also stated that "Specifically a spotter position requires a Class A CDL; Kenco could not waive this requirement or DOT certification."

143. TYSON was given a DOT certification.

144. TYSON at all times always possessed a valid Class A CDL.

19

145. Defendant failed to send Plaintiff for or follow through on DOT testing as requested in February of 2014.

146. These same restrictions outlined on the partial releases from 2013 to date allowed TYSON to be cleared to return to work by an independent physician used by the Defendants.

147. Defendants, Kenco and MARS, Inc., have made accommodations for other non-black persons to return to work, as well as, working in that capacity permanently.

148. Such as Harold Bell, a Caucasian male, who had formerly worked in the warehouse and who had been restricted from operating equipment in the warehouse due to having Tourette Syndrome.

149. Bell was given a position in sanitation- a janitorial function.

150. Bell worked the first shift, Monday through Friday.

151. Bell essentially swept and dealt with trash in the warehouse area.

152. The warehouse was over 600,000 square feet and it was impossible for one (1) individual to clean and maintain such a vast area.

153. Therefore, plaintiff asserts that there were other shifts and days available for Plaintiff to have worked in a janitorial capacity.

154. Defendant Kenco states in its position statement that it reviewed other positions and due to the lifting requirements Plaintiff could not perform these either.

155. Defendant's job descriptions and postings indicate that it may be occasional lifting. Exhibit 10

156. The occasional lifting was not an essential part of TYSON's job duties and responsibilities.

157. Consequently, this was not an essential job function as indicated by Defendant to the IDHR and EEOC.

158. Additionally, Defendant Mars and Kenco's policies dictate that work instructions and job analysis are to be performed for each job according to Defendants' policies ISO-QE- 4.2.4.001, ISO-BP-4.2.3.001, CP-BP-4.2.1.001and according to the Food Safety and Modernization Act.

159. Plaintiff also asserts that these documents were part of the library of documents that Defendant Mars required Defendant Kenco to turnover to them at the termination of their business relationship.

160. Therefore, Defendant knew at the relevant time and still knows today that Plaintiff's day to day job did not require him to lift anything greater than a two (2)-five (5) pound airline to connect the yard truck to the tractor trailer.

161. Furthermore, Plaintiff asserts that the product was typically palletized when it reached the Mars Manteno facility.

162. Plaintiff further asserts that if a pallet had to be built for specific orders, that Defendants had freight pickers who were assigned to perform that task.

163. Defendant had a standard operating procedure for freight picking. Exhibit 11

164. Plaintiff further asserts that the task of driving freight trucks outside in the yard and on the road ways were not interchangeable with freight picking in the warehouse.

165. Defendants made these accommodations for Harold Bell, Mark Baker, Tina Harris and others.

166. Plaintiff presented the same information in August of 2014 that it had told and presented to Defendant since August of 2013.

167. Defendant Kenco in August of 2014 returned Plaintiff to work with the same identical restrictions the Plaintiff had since August of 2013.

168. Plaintiff later learned that Defendants had been advertising for the Spotters position prior to June of 2014. Exhibit 6

169. Specifically, under Defendant Walsh's direction Defendants were actively and aggressively seeking to fill the position of Spotter; during the same exact time frame that Walsh was aware that TYSON had been available and actively trying to return to work at the Mars Manteno facility.

170. Additionally, Plaintiff asserts that it was Defendant Walsh's unabashed bias's that set the tone and pace of the future discriminatory patterns and practices that plagued TYSON and others.

171. Plaintiff asserts that despite his complaints to HR and corporate his concerns were not investigated or addressed.

172. Plaintiff asserts that this intentional failure to return Plaintiff back to work was rooted in race based discrimination and bias of Walsh the then General Manager and for no other reason.

173. Specifically, just weeks prior to TYSON's injury in May of 2013 the former management company issued a positive letter of recommendation regarding TYSON's performance. Exhibit 8

174. TYSON was returned to work and placed on a ninety (90) day probation, just as if, TYSON was a new hire.

175. No other employee at the Mars Manteno facility had been placed on a ninety (90) day probation period after being returned from a medical leave.

176. Plaintiff asserts that this probationary period was in retaliation for raising issues of discrimination, including race and disability.

177. Additionally, Plaintiff asserts that Defendants set in motion a scheme that would allow Defendants to terminate TYSON within that relative period, without giving rise to the true and unlawful reason for his termination.

178. Beginning in June 2014, younger white male spotters were hired at a higher rate of pay, as well as, being given premium shifts, than tenured African American, spotters.

179. Plaintiff and another African American Spotters raised issues with management and HR relative to the disparity in pay. Exhibit 12

180. Defendant KENCO failed to completely and fairly adhere to their own company policy. Choosing to completely ignore the Defendants' own company policy and exhibit a blatant disregard for the Civil Rights Act of 1866, as amended by the Civil Rights Act of 1991, 42 U.S.C. §1981, Title VII and other laws against discrimination.

181. Defendants Kenco and Mars grossly failed to remediate and mitigate the situations at hand.

23

182. Defendant KENCO and its agents maliciously and intentionally failed to follow the Federal Mandates and follow company policy with respect to TYSON's return to work while intentionally misrepresenting to TYSON that no work was available for him, when there was the same exact work available for whites.

183. This caused substantial and irreparable damage to TYSON.

184. TYSON alleges that his race and retaliation for his complaining about race based discrimination were substantial motivating factors in Defendant KENCO's:

(1) Refusal to pay TYSON his scale pay as a Spotter. (2) Refusal to return TYSON to any work, as well as, effectively returning him to the spotter position; (3) Failure to treat TYSON and other similarly situated non-white employees of Defendant KENCO fairly with respect to any adverse employment decisions; (4) Defendant's failure to follow its policies, custom and past practice, as well as, Federal Mandates, as it relates to making reasonable accommodations; (5) Defendant's failure to follow its policies, custom and past practice as well as, the Federal Mandates, as it related to employee's returning to work; and (6) its decision to continue to subject TYSON to hostile and discriminatory treatment.

185. After TYSON had questioned, complained and reported being discriminated against to corporate, Human Resource Personnel and management, TYSON was again retaliated against by being denied the opportunity to engage in full time work of 40 hours.

186. In further retaliation, harassment, intimidation, and imposed continued economic sanctions and deprivation, as well as, conspiracy, DEFNDENT KENCO contrived a scheme to willfully and intentionally misrepresent TYSON's return to work.

24

187. Upon TYSON's return to work TYSON was only allowed to work two (2) day work weeks for his employment; when other new non-black hires as spotter's were given 40 hours per week and overtime.

188. TYSON was also assigned less favorable shifts than other new non-black hires as spotter's, despite TYSON's 10 year plus seniority as a spotter.

189. To further belabor the grotesque and egregious actions of Defendant KENCO and Mars and their agents, Defendant returned TYSON to work denying him the opportunity to work in his designated position as a spotter by effectively forcing him to work in the warehouse.

190. TYSON's assignment to the warehouse was in opposite to Defendant KENCO's earlier posture of July 2013 effectively denying TYSON his right to return to work in any capacity.

191. As a direct result, of this contrived, willful and intentional infliction of emotional and economic distress and duress, of being denied a 40 hour work week, coupled with the continued pervasive and blatant discriminatory, hostile and disparate treatment, TYSON continued to fall prey to further punitive economic sanctions and deprivation, as well as, great emotional duress and stress.

192. To further perpetuate the pervasiveness of Defendants' Mars and KENCO's behavior, the denial of a regular 40 hour work week effectively denied TYSON the opportunity to engage in overtime when other new non-black hires of June and August of 2014, as Spotter's were given 40 hours and overtime.

193. Plaintiff also asserts that from May of June up through October of each year overtime is mandated by the Mars, Inc. employees can work in excess of 30 hours of overtime per week. Exhibit 13

194. In tandem of this contrivance, TYSON continued to be the victim of unequal terms and condition of employment in that he was subjected to a disparity in his rate of pay relative to similarly situated white, non-black, non-African American co-workers, that included recent hires.

195. On or about August 28, 2014 TYSON complained to Jabaley, corporate and Human Resource personnel about the nepotism and favoritism shown towards non-black employees that had been hired after TYSON's return to work; allowing new-hires, who were, non-black, non-African American, to work as a spotter with more favorable work shifts and better pay; while effectively denying him the opportunity to return to his position as a spotter.

196. On or about the weekend of August 31, 2014, Tom Leach was allowed to work as a Spotter.

197. Tom Leach at that time was not an employee of the Mars Manteno facility. Leach had not been vetted according to Defendants' Mars and KENCO's Standard Operating Procedure (SOP) for onboarding as it relates to hiring, as well as, the Federal Mandates of the Food Safety and Modernization Act (FSMA) and the Bioterrorism Act of 2001 (BOA). Exhibit 14

198. Leach was performing the same job that Defendants Mars and KENCO and it agents stated just a few days earlier in August of 2014 was not available to TYSON; while not being an employee of Defendants.

199. Specifically, Lopez told TYSON that the only work available to him was in the warehouse.

200. Additionally, Lopez told TYSON that if he did not accept the warehouse work that there was no work available to him.

201. On or about September 2, 2014, TYSON complained to Manzello and Human Resource personnel about the job assignment, the lack of hours being assigned to work as TYSON had ten years plus of service to the company, was a veteran, that the new non-black hires as spotters had more favorable work shifts, better pay and working in his position.

202. On or about September 8, 2014, TYSON made these same complaints to Lopez;

203. Lopez stated that he had to work in the warehouse, as that was the only work available for him and if he did not accept that assignment there would be no job for him.

204. During that same meeting, Jabaley became argumentative and physically aggressive and jumped in Plaintiff's face.

205. This statement is in direct contradiction to the email communication between Todd Moore the Senior Manager of Logistics, Robert Coffey-the RDM's boss, and Mike Manzello the Operations Manager several weeks prior and the various advertisements made by Defendants for Spotters. Exhibit 6

206. TYSON's alteration and reduction in shift and hours, as well as, the intentional and willful dereliction of duties and obligations under company and public policy was against the normal practices of the Defendants Mars and KENCO with respect to such alleged discrepancies and as such, violated Defendants normal due process afforded to affected parties.

27

207. Defendants' Mars and KENCO and their agents punitive actions directed toward TYSON were motivated by a racial animus, discrimination and retaliation, and was unjustified and violative of his rights under Federal and the state of Illinois anti-discrimination laws.

208. TYSON's similarly situated, white, non-black, non-African American co-workers were not subjected to humiliation, harassed, and punished in such a manner.

209. Additionally, Plaintiff and another African American were the only staff in his Department affected by the humiliation, harassment and punitive measures directed toward them.

210. None of TYSON's similarly situated, white, non-black, non-African American co-workers, such as Mark baker, Kelly Campbell, John Montgomery or Tom Leach were humiliated, harassed and subjected to such punitive measures.

211. After relentless questioning and complaining, along with assistance from the Veterans job assistance program, several weeks later, TYSON was returned to his position as a Spotter.

212. Immediately thereafter being returned to the spotter's position, TYSON was further subjected to other forms of retaliation, disparate treatment and harassment in that TYSON was coerced into taking unscheduled diabetic testing, as a newly imposed perquisite term and condition of his employment.

213. Department of Transportation (DOT) mandates testing one (1) time per year, unless physician restrictions are imposed.

214. TYSON had no restrictions imposed upon him mandating him to take these unauthorized and unscheduled diabetic testing's.

215. Defendants MARS and KENCO allowed similarly-situated, non-black, non-African American co-workers of TYSON, who were diabetic, to be exempt from taking unscheduled and out of sequence diabetic tests. Such as Kelly Campbell.

216. Unscheduled diabetic testing is inaccurate and inconclusive.

217. TYSON was accused of being hostile, angry and aggressive because he opposed not being on a schedule, not being a 40 hour work week, being paid disparately, being forced to take numerous non-regulatory mandated diabetic testing, as well as, drug test under the circumstances of being coerced and intimated into doing so under the threat and duress of being discharged for failing to comply.

218. Other non-black Spotters were not subject to such testing.

219. Kelly Campbell had an accident tearing a trailer door off its hinges.

220. Campbell was not sent for a drug test immediately as required by company policy.

221. Campbell was allowed to complete his shift.

222. Campbell was also allowed to work the next day, without any lapse in employment after a worktime accident.

223. TYSON and another black spotter for any minor infraction would be routinely sent by Valerie Lillie, Quality Coordinator/Safety for drug and or diabetic testing.

224. Non-black spotters such as Campbell, Metke, and others were not subject to such testing.

225. Non-black spotters such as Campbell, Metke and others were not subject to such scrutiny.

226. Non-black spotters such as Campbell, Metke, and others were not subject to such terms and conditions of employment.

227. Plaintiff believes that this behavior and treatment was demeaning, harassive and retaliatory for making formal complaints about raced based disparate and disparaging treatment and impact.

228. TYSON continued to be further subjected to other forms of disparate treatment and harassment, after TYSON continued to question, complain and report the matters to Human Resource personnel, TYSON and other African Americans were subjected to harsher discipline and closer scrutiny than his similarly situated, white, non-black, non-African American co-workers. Such as but not limited to: frequent drug testing and sanctioned time off work.

229. TYSON and other African Americans have been subjected to public humiliation, harassment, retaliation, and retribution when questioning or complaining about working conditions, as well as, the unfair discriminatory treatment and practices of Defendant Mars and KENCO and their agents while his white, non-black, non-African-American counterparts were not subjected to such treatment.

230. Defendant Mars and KENCO and its various agents, in turn became more openly hostile, retaliatory and discriminatory towards TYSON as well as other black and African American employees and those who opposed such disparate treatment encouraging supervisors, leads and other non-black, non-African workers under their management to do likewise. This included but was not limited to all phases of employment, i.e.: hiring, discharge, performance management, conditions of employment, promotion, paid time off, furlough/leave of absences, discipline, work shifts, benefits, and wages.

231. Defendants sought every opportunity to treat TYSON unfairly in relation to similarly situated, white, non-black, non-African American co-workers, who did not oppose disparate and disparaging treatment of African Americans.

232. The harassment and discrimination followed the complaint to corporate, management and Human Resources within such a period of time as to raise an inference of retaliatory motivation.

233. Defendant Mars and KENCO's policies dictate that when such infractions and discrepancies occur within the facility, proper company protocol and procedure are to be followed as it relates to the Standard Operating Procedure relative to incident reporting and investigations. e.g. CP-RM-6.2.101, CP-BIC-802, and CP-RM-6.4.120

234. Defendants Mars and KENCO hired Kelly Campbell in 2013, a white, non-black, non-African American, male as a Spotter. Campbell was not subjected to such discriminatory, unequal terms and conditions of his employment as was TYSON.

235. Defendants Mars and KENCO also hired external candidates for the Spotter positions. These similarly situated, non-black, non-African American co-workers of TYSON were Carl Metke, Mark Baker, and Tom Leach whom were hired during the period of the of summer 2013 to August 2014. None of these persons were subjected to such discriminatory, unequal terms and conditions of their employment as was TYSON.

236. Defendants Mars and KENCO's, window clerk, John Montgomery, was promoted to a Spotter, a white, non-black, non-African American, male failed to meet Defendants' minimum qualifications as a Spotter according to Defendants policy CP-RM-6.4.301; inasmuch as he did not have the prerequisite of a commercial driver's license (CDL) and was not lawfully able to operate a semi-trailer

truck, although he did; Montgomery was paid an even higher rate than other more qualified African American spotter's and was given a premium shift and overtime. Exhibit 12

237. Defendants Mars and KENCO's newly hired and or promoted, non-black, non-African American Spotter's received prevailing pay and more favorable assignments and shifts than TYSON and other similarly situated African Americans.

238. Such pervasive and blatant discriminatory, hostile and disparate treatment by Defendant KENCO, gave rise to a rash of harassment from other employees and subordinates.

239. TYSON, along with those who opposed such treatment, were subjected to discriminatory treatment.

240. Plaintiff is informed and believes, and on that basis alleges that, at all times relevant to this action, Plaintiff and Defendants had a fiduciary relationship upon which Plaintiff justifiably relied to his detriment.

241. Plaintiff asserts that Paula Hise the VP of Operations on behalf of Kenco Mars extended a written offer for him to continue his employment at the Mars Manteno facility. Exhibit 15

242. Plaintiff asserts that as a term and condition of Plaintiff's employment that Plaintiff had to sign and return the written offer letter as acceptance of the position, as referenced in Defendants policy CP-HR-1002. Exhibit 16

243. Plaintiff also asserts that Exel Human Resources offered Plaintiff a similar letter in February of 2015 that Plaintiff needed to sign and return as a condition of continued employment. Exhibit 17

32

244. By virtue of the relationship between Plaintiff and Defendants, a fiduciary duty existed.

245. Plaintiff believes that Defendant breached its fiduciary obligation to TYSON.

246. Pursuant to said duty, Defendants owed the utmost good faith and fairness to Plaintiff in all matters pertaining to Defendants' conduct with respect to Plaintiff's' employment and all the terms and conditions imposed upon Plaintiff. Including, but not limited to: equal terms and conditions of employment, as it related to return to work, progressive disciplinary actions, investigations and the like, as well as, the compliance to public policies.

247. Plaintiff believes that Defendants intentionally and wilfully breached and violated public policy, as it relates to being free from a hostile and racially animus work environment, being subjugated to unequal terms and conditions of employment, as well as, disparate and disparaging treatment and impact.

248. Defendant also sanitized TYSON's personnel file of TYSON internal written complaints and communications, relevant documents, such as but not limited to: TYSON doctor's notes, inquiries and complaints about his shift, and other incidents, as well as, incident investigation notes, commendations, and other documents relative to TYSON's employment that were mandated by company policy to be kept as a matter of ordinary business record keeping practices.

249. Plaintiff believes that Defendant sanitized his personnel file as another breach of its fiduciary duty to Plaintiff as it relates to their employment relationship and to defeat Plaintiff's claims of discrimination.

250. In another breach of fiduciary duty Plaintiff believes that Defendant refused to cure the deficiencies in Plaintiff's file to further its contrived schemes.

33

251. Defendants again breached its fiduciary obligation to TYSON by intentionally and willfully failing to investigate the internal complaints as outlined in the company's policy and required by public policy. e.g. CP-RM-6.2.101, CP-BIC-802, and CP-RM-6.4.120

252. Defendants knew that it had failed to follow its own policies and procedures, as well as, public policy.

253. Defendant knew that it was wantonly, intentionally and willfully creating an animus and hostile work environment.

254. Defendants again breached its fiduciary obligation to TYSON by intentionally and willfully failing to pay TYSON the prevailing rate of pay and administer its rules, policies, procedures, protocols and the like equitably.

255. Defendants again breached its fiduciary obligation to TYSON by intentionally and willfully allowing John Montgomery to perform the same job as a spotter as TYSON and Ringo, who were African American; while disallowing Montgomery, non-black, to be required to meet the minimum qualifications of having a valid CDL;

256. Defendants payed Montgomery more wages; while requiring less of Montgomery.

257. Defendants administered its rules, policies, procedures, protocols and the like inequitably.

258. Defendants knew it hired John Montgomery against and in violation of its own policies and requirements for a Spotter.

259. Defendant knew that John Montgomery failed to meet the minimum requirements as a Spotter.

260. Defendant knew it had retaliated against TYSON by subjecting him to unequal terms and conditions of employment.

261. Defendant suspended TYSON for a minor infraction of a cracked mirror.

262. Defendant suspended TYSON for almost a week.

263. Defendant again breached its fiduciary obligation to TYSON by vexatiously, intentionally and willfully failing to return TYSON back to work after a routine drug test.

264. Again another intentional and willful interference in the employment relationship between TYSON and the Mars Manteno facility.

265. Defendant continued to subjugate TYSON to wanton, intentional and willful interference, as well as, wanton intentional infliction of emotional stress and duress, as well as, once again breaching its fiduciary obligation to TYSON: When Defendant suspended TYSON's employment for almost a week, without pay.

266. Defendants intentionally, willfully, wantonly, wand woefully used economic sanctions as tactics used to subjugate its employees.

267. Specifically, Tammi Fowler stated that was the best way to get the employee was to hit them in the pocket.

35

268. Defendants' tactics were a type of intentional and willful psychological warfare, with economic realities.

269. Defendants' tactics were a type of intentional and willful psychological warfare, intentionally used to cause intentional infliction of emotional distress, economic deprivation, destabilization, bullying, and interference with TYSON's and others employment and well-being.

270. These sanctions were typically imposed upon African-Americans.

271. Defendant used these and other sanctions to make examples out of those who opposed disparate and disparaging treatment and impact.

272. Defendants knew these and other actions would cause irreparable harm to TYSON and others.

273. As a direct and proximate result of Defendants' action, plaintiff suffered serious injury, including but not limited to extreme embarrassment, humiliation, anxiety, fear, ridicule, physical upset and emotional distress, as well as, economic deprivation.

274. Plaintiff is informed and believes and thereon alleges that Defendants' conduct was intentional and malicious and done for the purpose of causing Plaintiff to suffer humiliation, mental anguish, and emotional distress, as well as, to avoid culpability and offer a legitimate non-discriminatory reason for termination.

275. Defendants' conduct in confirming and ratifying that conduct was done with knowledge that Plaintiff's emotional distress would thereby increase, and was done with a wanton and reckless disregard of the consequences to Plaintiff.

276. Defendants, in breach of the duty described above, negligently and carelessly handled Plaintiff's employment status, causing Plaintiff to incur unnecessary costs and expenses, otherwise burdening Plaintiff with unnecessary and excessive debts, as well as, defaming and diminishing TYSON's professional standing by purporting a contrived scheme riddled with flaws that TYSON had committed some other egregious violation.

277. Defendant maintains in their position statement that Plaintiff was just merely inconvenienced; and suffered no harm.

278. Defendants chose the least desirable accommodation to afford TYSON.

279. The accommodation imposed upon TYSON was a leave of absence without pay.

280. What reasonable person would equate the absence of income or revenue for more than a year to a mere inconvenience; this was an economic loss to TYSON.

281. TYSON offered to come back in any capacity available at the facility that matched his medical restrictions; including but not limited to a window clerk or sanitation worker.

282. Plaintiff is informed and believes and thereon alleges that Defendants' conduct was intentional and malicious and done for the purpose of causing Plaintiff to suffer humiliation, mental anguish, and emotional distress, as well as, to avoid culpability and offer a legitimate non-discriminatory reason for termination.

283. Defendants' conduct in confirming and ratifying that conduct was done with knowledge that Plaintiff's emotional distress would thereby increase, and was done with a wanton and reckless disregard of the consequences to Plaintiff and Plaintiff's family.

37

284. Defendants, in breach of the duty described above, negligently and carelessly handled Plaintiff's employment status, causing Plaintiff to incur unnecessary costs and expenses, otherwise burdening Plaintiff with unnecessary and excessive debts, as well as, defaming and diminishing TYSON's professional standing by purporting a contrived scheme riddled with flaws.

285. Plaintiff believes that Defendant breached and violated public policy, as it relates to being free from a hostile and racially animus work environment, being subjugated to unequal terms and conditions of employment, as well as, disparate and disparaging treatment and impact.

286. In addition, Plaintiff believes that Defendant knew that their actions would cause irreparable harm to TYSON and others.

287. In continuum of Defendants' willful, wanton, and intentional subjugation of contrived interference, emotional distress, harassment, retaliation, economic sanctions TYSON was not put on a work schedule until December of 2014.

288. No other similarly situated non-black spotter was left off the work schedule.

289. Matter of fact, no other employee at the facility was left off the work schedule.

290. Defendants contrived this scheme to inflict intentional and willful emotional distress and interference with TYSON' employment relationship with the Mars Manteno facility.

291. Defendants intentionally, willfully, and maliciously failed to reasonably correct the racially charged, animus, and hostile work environment, but made every effort to continue to foster it along with its twisted tolerances of racism, sexism, discrimination of various kinds, as well as, other unlawful idioms.

38

292. In continuum of Defendants' aggregate aforementioned behaviour, Defendants continued to subjugate TYSON and others to other forms of unlawfulness.

293. Plaintiff also believes that Defendant also intentionally and willfully interfered with his right to enjoy his protected rights of a fair due process of law.

294. Plaintiff also alleges and believes that Defendants committed obstruction by deception.

295. Defendants and their agents knowingly and willingly engaged in misleading conduct by altering Plaintiff's personnel file, as well as, supplying misleading witnesses, information and documentation to hinder the administration of justice at the Illinois Department of Human Rights, Illinois Department of Labor, and EEOC, as well as, the then pending administrative proceedings that would make TYSON whole.

296. Plaintiff also alleges and believes that Defendants committed obstruction by destruction of evidence.

Defendants knowingly and willingly engaged in unlawful conduct by altering Plaintiff's personnel file to impede the administration of justice at the Illinois Department of Human Rights, Illinois Department of Labor and EEOC, as well as, the then pending administrative proceedings that would make TYSON whole.

297. Plaintiff also alleges and believes that Defendants committed obstruction of justice by destruction of evidence.

Defendant knowingly and willingly engaged in unlawful conduct by altering Plaintiff's personnel file, as well as, statements of account on TYSON' behalf to obstruct the administration

39

of justice at the Illinois Department of Human Rights, Illinois Department of Labor and EEOC, as well as, the then pending administrative proceedings that would make TYSON whole.

298. Plaintiff also alleges and believes that Defendants committed obstruction of investigations by destruction of evidence.

Defendants knowingly and willingly engaged in unlawful conduct by altering Plaintiff's personnel file, inclusive of the investigation file and other relevant parts of TYSON' file commensurate to the company's to personnel file keeping policies and practices, to impede the administration of justice at the EEOC, as well as, the then pending administrative proceedings that would make TYSON whole.

299. Plaintiff also alleges and believes that Defendants committed obstruction of an administrative proceeding.

Defendants knowingly and willingly engaged in unlawful conduct by altering Plaintiff's personnel file, as well as, supplying misleading witnesses, such as Jay Elliott, information and documentation, including, but not limited: the verified response and position statements, as well as, company policies, procedures and the like, to impede the administration of justice at the Illinois Department of Human Rights and EEOC, as well as, the then pending administrative proceedings that would make TYSON whole.

300. Plaintiff also alleges and believes that Defendants committed perjury.

Defendants knowingly and willingly and contrary to oath engaged in unlawful conduct by deliberately supplying misleading witnesses, witnesses without firsthand information, false statements, verifications, position statements and documentation as material facts to impede the administration of justice at the Illinois Department of Human Rights and Employment Security and EEOC, as well as, the then pending administrative proceedings under oath, as well as, verifi-

40

cation, and certification that would make TYSON whole. e.g. Defendant's verified response and position statements.

301. In October or November 2014, Jay Elliott and several unknown "Kenco Co-Conspirators" engaged in the contrived scheme to hire Jay Elliott as Vice President of Legal.

302. Plaintiff asserts that this scheme was contrived to avoid culpability and liability of the Defendants.

303. According to Defendant Kenco's policy CP-HR-1002 it would require the Chief Financial Officer, the Group President and at least another VP to hire Elliott as a VP.

304. The plaintiff then alleges that all of the Defendants (presumably including the "Co-Conspirators" of Defendants) were the agents and principals of all of the other defendants and were acting in the course and scope of their authority when they hired Jay Elliott.

305. Plaintiff also alleges and believes that Defendant committed a conspiracy to obstruct and commit fraud against the court.

    1.    Elliott stated to the Illinois Department of Human Rights and EEOC that he was representing Defendant.

    2.    Defendant was informed with every filed charged that charges were cross filed with the IDHR and EEOC.

    3.    Defendant was informed of the EEOC's recordkeeping and reporting requirements.

4.    Defendant was also informed as a matter of the ordinary course of business the participation requirements for participating in a Fact Finding Conference.

Some examples are:

a.    Defendants knowingly and willingly represented its Vice President of Legal as an individual who had firsthand knowledge of the material facts and/or matters relating to TYSON and others by allowing him to be a participant in the Fact Finding Conferences for the Illinois Department of Human Rights and EEOC investigation, part of the exhaustive remedy process of Title VII, ultimately a precursor to an obstruction of the Federal Court.

b.    Defendant Kenco knew that it had an admitted history to the court of a pattern and practice of disparate and disparaging treatment and impact towards African Americans; specifically Jay Elliott informed the court of such in *Brown vs. Kenco*. {Case # 3:10-CV-668 in the Eastern Division of Virginia Richmond Division}

c.    Defendants knew it had in excess of 30 discrimination charges filed against Defendants at the Mars Manteno Facility.

d.    Defendants Kenco and Mars knew that these and other infractions, if found liable, would be a breach of contract with MARS, Inc.

e.    Defendants knew it was truth to the charges filed.

f.    Defendant knew it had violated a number or public policies.

g.    Defendants crafted and contrived a plan to employ Jay Elliott as an employee of Defendant Kenco.

42

h.  Defendant Kenco and Elliott discussed Defendant's employment expectations, goals and the like.

i.  Defendant Kenco and Elliott agreed upon terms and conditions of Elliott's employment.

j.  Defendants and Elliott knew that Elliott's employment would circumvent Illinois Department of Human Rights and EEOC guidelines.

k.  Defendants knew it would impede the exhaustive remedy process to the administration of justice in postulating Elliott as an employee of the company with firsthand knowledge.

l.  Defendants knew Elliott was a licensed and practicing attorney in the state of Tennessee

m.  Defendant Kenco knew that it had retained Elliott as outside counsel in other employment related matters. {Case # 3:10-CV-668 in the Eastern Division of Virginia Richmond Division}

n.  Defendant Kenco had a well-established relationship with Elliott, Karen Smith and Miller & Martin PLLC. {Case # 3:10-CV-668 in the Eastern Division of Virginia Richmond Division}

o.  Defendants knew Elliott was not hired until after the incidents occurred relative to TYSON.

p.  Defendants knew that Lori Varvel was not hired as the dedicated Human Resource Manager until after the incidents occurred relative to TYSON in November of 2014.

q.  Defendants knew that Elliott was not physically situated at the Mars Manteno facility.

r.  Defendants knew that Jay Elliott and others such as Tammi Fowler, Senior Manager of Employee Relations, Joe Smith-Safety Manager, Cathy Phillips-Benefits Manager, Suzanne Moore-Benefits Administrator, Michelle Hosford- Fleet Safety Specialist, were in Chattanooga, Tennessee, as well as, David Jabaley-Director of Operations who during most of the relevant time was situated in Chattanooga could not have been a party to the incidents in question.

43

s.   Defendants believed that it could conspire with its employees and agents not be subject to conspiracy.

t.   Defendants knew that as an attorney Elliott would not be allowed to be an active participant in the Illinois Department of Human Rights and EEOC investigations.

u.   Defendants knew that it had terminated some of the agitators and provocateurs of the allegations set forth by TYSON and others.

v.   Defendants knew that it did not have supporting witnesses to incidents.

w.   Defendant Kenco reported to Illinois Department of Human Rights and EEOC that it no longer had its witnesses.  Exhibit 19

x.   Defendants Mars and Kenco knew that the incidents with TYSON and others had been contrived and/or valuated differently than those committed by similarly situated non-blacks or those who did not oppose such disparate and disparaging treatment and impact upon African-Americans.

y.   Defendants Mars and Kenco knew that it had ostracized its onsite Human Resource Personnel from formal investigations and the like.

z.   Defendants Mars and Kenco knew it had undermined its onsite Human Resource Personnel from performing their charged duties at the Mars Manteno facility.

aa.   Defendants Mars and Kenco knew that the onsite Human Resource Personnel had reported the disparate and disparaging treatment and impact upon African-Americans and those who opposed such treatment to management and Kenco Corporate office.

bb.  Defendants Mars and Kenco knew that the onsite Human Resource Personnel had opposed the disparate and disparaging treatment and impact upon African-Americans and those who opposed such treatment.

cc.  Defendants Mars and Kenco knew that it had misrepresented the onsite Human Resource Personnel stance on the reporting of the disparate and disparaging treatment and impact upon African-Americans and those who opposed such treatment to the Illinois Department of Human Rights and EEOC.

dd.  Defendants Mars and Kenco knew that it deviated from its organizational structure at the Mars Manteno Facility.

ee.  Defendants Mars and Kenco knew that Elliott had no firsthand knowledge.

ff.  Defendants Mars and Kenco knew that they had not taken reasonable steps to correct the hostile and animus work environment for TYSON and others.

gg.  Defendants Mars and Kenco knew it did not follow its own policies and procedures.

hh.  Defendants Mars and Kenco knew that the Illinois Department of Human Rights and EEOC would assume that Elliott and others were legitimate employees of Defendant(s).

ii.  Defendants Mars and Kenco knew that employing Elliott would give him a legitimate reason to be a party to Defendant's administrative proceedings.

jj.  Defendants Mars and Kenco knew that the Illinois Department of Human Rights and EEOC would rely on the information provided by Elliott to make an administrative determination.

kk.   Defendants Mars and Kenco knew that Elliott would have an unfair advantage over TY-SON and others, as an Expert in Law and Subject Matter Expert in employment Law.

ll.   Defendants Mars and Kenco knew that Elliott would be able to mitigate any statements of fact made by Plaintiff's because of his expertise and knowledge.

mm.  Defendants Mars and Kenco knew that Elliott would be able to use his expert knowledge to aid and abet Defendants in the violation of TYSON and others protected rights by deception, conspiracy, manipulation of material facts to Defendant's advantage, presenting materially false and misleading documentation and statements to the Illinois Department of Human Rights and EEOC, impede and obstruct the administration of justice, commit fraud on the court, perjury and a number of unconscionable contrived schemes.

nn.   Defendants knew it was evading the law and circumventing justice.

oo.   Defendants Mars and Kenco knew that evading the law and circumventing justice at the IDHR and EEOC was a precursor to the obstruction of pending federal court proceedings.

pp.   Defendants Mars and Kenco knew its beahvior's toward the employees of the Mars Manteno, as well as, the administration of justice were/are unlawful, disingenuous, and contrived.

qq.   Defendants Mars and Kenco knew that it aided and abetted the violators of company and public policy that included but was not limited to Mars Manteno employees and Kenco Corporate employees.

rr.   Defendants Mars and Kenco knew that it had discriminated against TYSON.

ss.   Defendants Mars and Kenco knew it minimalized its actions.

tt.   Defendants hedged on prevailing at the IDHR and EEOC through its contrived scheme to avoid culpability and liability.

uu.   Defendants knew this would cause irreparable harm to TYSON and others.

vv.   Defendants knew that providing misleading, deceptive, disingenuous statements and documents would make it more encumbering and difficult for TYSON and others to prevail.

   i.   Defendants knew it hired and promoted John Montgomery against and in violation of its own policies.

   ii.   Defendants knew that it intentionally created a racial, animus and hostile work environment for TYSON and others.

   iii.   Defendants knew it had retaliated against TYSON by suspending him, drug and diabetic testing him, denying him overtime and equal terms and conditions of employment and writing him up.

306. Defendants Mars and Kenco also conspired with Mars Manteno employees, such as, but not limited to: Kelvin Walsh, Mike Manzello, Mario Lopez, Valerie Lillie and others.

307. Plaintiff also believes that Defendant, Kenco's, Executive Management and other employees participated in the various contrived schemes by ratifying and sanctioning the employment of Jay Elliott, as VP of Legal.

308. Plaintiff also alleges and believes that Defendants committed obstruction by mail.

   Defendant knowingly and willingly used the United States Mail or federally governed entity to further its scheme of fraud by mailing Plaintiff's altered personnel file, as well as, supply-

ing misleading witnesses, information and documentation to impede the administration of justice at the Illinois Department of Human Rights and EEOC, as well as, the pending judicial proceedings that would make TYSON whole.

For example:

a.  Mailing to the IDHR and EEOC non-effectuated and irrelevant policies.

b.  Mailing to the IDHR and EEOC verified responses and positions statements under oath and/or perjury that contained deceptive, fraudulent, misleading and disingenuous information that reference policies and procedures that were not relevant to TYSON to commit fraud against the administration of justice and TYSON.

309. As an officer of the court and subject matter experts Elliott, Defendants and their agents knew better.

310. Plaintiff also believes that his rights were violated under 42 U.S.C. §1983 & 1985.

311. Plaintiff believes that the Illinois Department of Human Rights, herein referred to the "department" and its investigators acted in concert with Defendants to engage in a course of action that would deprive the Plaintiff of his constitutional rights.

312. The Plaintiff then alleges that all of the Defendants (presumably including the "IDHR Staff") were the agents and principals of the department and were acting in the course and scope of their authority.

313. The Illinois Department of Human Rights allowed Defendants to further it schemes by allowing the Defendant to engage in the investigatory process; despite the Defendants admitting that it had no witness. Exhibit 19

314. The Illinois Department of Human Rights allowed Jay Elliott to be the Attorney for the Defendant, as well as, the witness in TYSON and other complainant's cases before the department.

315. Plaintiff asserts that these actions were a conflict of interest and unethical.

316. The "department' states in its disseminated correspondence in a matter of course of ordinary business that attorneys will not be allowed to engage on behalf of any party.

317. The "department' states in correspondence in a matter of course of ordinary business that a failure to participate in the proceedings can constitute a default.

318. Defendant admitted to the "department" on numerous occasions that it had no witnesses, as it lost its contract and no longer had access to its former employees. Exhibit 19

319. Plaintiff and others believe that there had to be a concerted meeting of the minds between Defendants and the "department" to allow Defendant to operate outside the authority granted to the "department" by law.

320. Jay Elliott was hired by the defendant after the relevant time to TYSON and other complainant's charges before the "department."

321. Additionally, Elliott was situated in Chattanooga, TN; therefore, even if Elliott was employed during any relevant time, Elliott was not at the Mars Manteno facility nor was Elliott part of any first hand investigatory efforts or actions.

322. Jay Elliott filed an appearance on behalf of Kenco dated December 11, 2015 at The Illinois Department of Human Rights.

323. Jay Elliott was the witness in TYSON's Fact Finding Conference on January 6, 2016.

324. Prior to January 6, 2016, TYSON's then legal counsel raised the issue of Jay Elliott's participation as the witness in the January 6, 2016.

325. At the commencement of the January 6, 2016, Fact Finding Conference, TYSON again raised the issue with The Illinois Department of Human Rights Investigator Defrates about Elliott's participation and lack of firsthand knowledge.

326. Elliott indicated in the Fact Finding Conference that Walsh, then General Manager, nor the company had any knowledge that TYSON was disabled.

327. Walsh was initially supplied with an email from TYSON's then supervisor on or about May 22, 2013, indicating that TYSON would possibly have to have surgery on his wrist.

328. TYSON was placed on FMLA in May of 2013. Exhibit 9

329. It was impossible for Walsh nor the company not to know of TYSON's injury, absence and the like;

330. Walsh was responsible for the overall workflow of the Mars Manteno facility and he reported to the onsite Regional Distribution Manager.

331. Walsh and others were so much so aware of TYSON's absence and the impact on the work-flow that they hired a replacement for TYSON, Mark Baker.

332. Additionally, there was usually only one (1) spotter pre shift.

333. Consequently, Walsh, Manzello, Coffey, Moore and others would have known that they were down a spotter, as the workflow would have been halted.

334. Racial slurs, epithets, degrading and demeaning remarks were made about TYSON and others by Mars Manteno upper management Kelvin Walsh, Mike Manzello and Mario Lopez, as well as, Kenco Logistics Tammi Fowler, Dan Dey, David Jabaley and others. Stating that they should just pay those "niggers" off.

335. TYSON was paid an hourly rate and at times eligible bonuses. As part of his employment compensation package, he also received or was entitled to medical benefits, insurance, Paid Time Off and overtime as well as other benefits.

336. TYSON was wantonly, intentionally, willfully, and continually harassed, subjugated and retaliated against throughout his tenure of employment with Defendant.

337. While managed by Defendant Mars agents Kenco and Exel, TYSON was the victim of race and disability discrimination, harassment, retaliation coercion, conspiracy, willful and intentional interference, as well as, a hostile and animus work environment.

338. TYSON alleges that he and other African American co-workers belonging to protected classes pursuant to the federal and the state of Illinois anti-Employment Discrimination laws were held to different standards than other employees of Defendant.

339. TYSON alleges that African Americans and other employees that are members of the pro-tected class have substantially lower employment and retention rates at KENCO, due to unfavora-ble terms, conditions and privileges of employment, such as: (1) lack of equal opportunity; (2) unfair and poor treatment; and (3) less tolerance and leniency when making adverse employment decisions, amongst other things.

340. TYSON believes KENCO has a disproportionately lower number of African American em-ployees in various management level positions.

341. TYSON alleges that there were substantially more non-African American employees, especially in management level positions, at the Manteno facility, as well as, other facilities.

342. The non-African American employees at the Manteno facility were treated much more favorably than TYSON and other African American employees.

343. Defendants intentionally misrepresented to Plaintiff his job's compensation and that they were in compliance with TYSON's return to work requests. This was not the case.

344. Moreover, TYSON alleges that other similarly situated, non-black, non-African American co-workers were not subjected to such treatment.

345. From 2013-2015, TYSON was unfairly singled out and treated differently from his non-African American colleagues due to his race.

346. TYSON's employment eventually ended on May 13, 2015.

347. The reason given by Defendant Exel for TYSON's discharge was that Plaintiff was unable to drive a reach truck. Exhibit 1

348. Plaintiff asserts that Mark Baker was not terminated because he was not able to perform his job duties as a spotter; e.g. required to drive a reach truck amongst other duties.

349. More specifically, Baker was not able to perform the essential duties and responsibilities as a Spotter.

350. Plaintiff also asserts that no other Caucasian Spotter was subjected to this adverse employment decision.

351. Plaintiff asserts that this reason was pretextual, as it was not a part of Plaintiff's job duties to responsibilities to drive a reach truck.

352. Plaintiff also asserts that this adverse employment decision to terminate Plaintiff on May 13, 2015 was retaliatory for complaining about and filing claims of race based discrimination, hostile work environment and claims of violations of the Americans with Disability Act.

353. Plaintiff assert that the decision to terminate Plaintiff was made and executed within days of receiving TYSON's most recent formal charge of discrimination that was filed on April 24, 2015 with the IDHR and EEOC-Charge Numbers 2015CA2692 and 21B-2015-01261, respectively.

354. Plaintiff asserts that the reason was pretextual, as TYSON's job title differed on his termination letter from that of his offer letter of employment. Exhibit 1 –Yard Driver/Fork Lift Operator and Exhibit 17-Yard Driver respectively.

355. Plaintiff asserts that he had not had a change in roles, responsibilities or titles.

356. Plaintiff also asserts that no other non-African American spotter had been subjected to having their roles, responsibilities or title changed nor were they terminated.

357. Plaintiff asserts that he filed these charges because of continuing violations of race based discrimination, the volatile and openly racially charged hostile work environment.

358. Plaintiff also asserts that Robert Coffey, Todd Moore and others of Mars, Inc. instructed Exel to terminate Plaintiff.

359. Plaintiff also asserts that Robert Coffey and Todd Moore routinely and often made or influenced employment decisions at the Mars Manteno facility. e.g. Coffey the RDM for the Mars Manteno facility overrode a decision that its manager Kenco made to terminate William Schwerin and instructed Kenco to reinstate William Schwerin, after he had been formally terminated.

360. Plaintiff also asserts that Coffey and Moore weighed in other employee issues, such as employee management: from discipline to perceived behavioral issues to leadership deficiencies amongst other things. Exhibit 20

361. Plaintiff also asserts that even at the beginning of his employment Plaintiff has always known Mars through its RDM and other managers to control the workflow and the workplace at the Mars Manteno facility.

362. Plaintiff also asserts that every operational decision regarding the Mars Manteno facility was at the very least conferred with Mars, Inc. prior to implementation.

363. Plaintiff asserts that Robert Coffey was onsite and the General Manager amongst others daily conferred with Coffey and received directives from him throughout the day. Exhibit 21

364. Coffey and other Mars, Inc. logistics managers were aware incidents and of the hostile and animus work environment at the Mars Manteno facility. Exhibit 22

365. Specifically, Plaintiff heard Coffey state after a racially motivated incident that led to the termination of an African American employee Vernon Henry that this is how our southern brothers and sisters handle things.

366. Furthermore, employees resigned their employment because of the discriminatory and hostile work environment.

367. Specifically, Tom White resigned after being forced by Walsh the then GM to treat employees discriminately. Exhibit 23

368. Personnel change announcements were made by Coffey and others about the changes in various personnel at the Mars Manteno Facility. Exhibit 24

369. Additionally, Defendants settled claims of discrimination of employees of the Mars Manteno facility. Specifically, with Jacque Morrison

370. Moreover, Defendant Kenco stated to the IDHR and EEOC in charge no. 2015-CA-3083 /21BA51535 that it hired Lori Varvel because of all of the charges of discrimination filed against them.

371. Additionally, Todd Moore indicated in an email to Robert Coffey and others in September of 2014 that there was a "desperate" need for a HR person at the Mars Manteno facility, to which he on behalf of Mars, Inc. approved the hiring. Exhibit 25

372. Plaintiff asserts that it can be easily inferred that the "desperate need" for a HR person arose out of the racially charged and hostile work environment that facilitated the filing in excess of 30 charges {all the charges} of discrimination with the IDHR and EEOC.

373. Plaintiff also asserts that it was in retaliation for his race based complaints of discrimination that he was terminated.

374. Plaintiff asserts that his termination was wrongful.

375. Plaintiff further asserts that Defendant Exel and Mars intentionally interfered with his rights to enjoy unemployment compensation after being wrongfully terminated.

376. Defendants intentionally misrepresented to the Illinois Department of Unemployment that Plaintiff's termination was related to misconduct. Exhibit 26

377. Defendants' intentional misrepresentation vexatiously delayed Plaintiff's unemployment compensation.

378. Defendants' acts caused Plaintiff intentional infliction of emotional duress and stress, as it left Plaintiff without income for a significant period of time.

379. Defendants' actions left Plaintiff unable to take care of himself or his family.

380. Defendants' acts caused Plaintiff irreparable economic harm, as it left Plaintiff without income for a significant period of time.

381. In 2015 and 2016, Defendant KENCO willfully submitted false and misleading information to Regulatory and Public Policy agencies. Such as, but not limited to Illinois Department of Human Rights and EEOC.

382. Defendant KENCO's actions toward TYSON were unlawful, malicious, deceptive, defamatory, slanderous, fraudulent and contrary to principles of fairness and common decency.

383. Plaintiff's attorney or attorney representative was not allowed to participate in the Fact Finding Conference, unlike Defendant Kenco's attorney of record Jay Elliott.

384. This was not the first time that this issue had been raised with The Illinois Department of Human Rights and specifically with Investigator Defrates relative to Jay Elliott's employment relationship with Defendant Kenco.

385. As early as, September of 2015, The Illinois Department of Human Rights, Investigator Defrates had been given documentation from Elliott's LinkedIn page in another matter indicating that defendant employed him in November of 2014.

386. At the same time, The Illinois Department of Human Right, Investigator was also presented with other documentation from other witnesses LinkedIn pages confirming either their employment dates and or physical location.

387. The Illinois Department of Human Rights allowed others such as Tammi Fowler to be witnesses on behalf of the Defendant without having firsthand knowledge of TYSON and other complainant's cases before the department.

388. The Illinois Department of Human Rights had been made apprised of similar and/or same instances of either persons being used as witnesses by defendant that had no information and/or firsthand knowledge or who were not employed by defendant during the relevant times of the various Plaintiffs' instances, as well as, other various matters of concern.

389. Beginning in April of 2015, the Director of The Illinois Department of Human Rights "IDHR Staff" was contacted and made apprised of these matters.

57

390. In May of 2015, the Chief Legal Counsel for The Illinois Department of Human Rights "IDHR Staff" was contacted and made apprised of these matters.

391. Simultaneously, complaints were filed with the OEIG regarding the behavior of The Illinois Department of Human Rights with regard to the defendant.

392. In July of 2015, Acting Executive Inspector General was contacted requesting an investigation into the matters at hand between The Illinois Department of Human Rights and defendant.

393. The OEIG took the position that this was an internal issue at The Illinois Department of Human Rights and that they should address the issues at hand.

394. In September of 2015 the Charge Processing Division Manager of the "department" "IDHR Staff" was contacted regarding the issues at hand.

395. Nearly every level and functionality of the "department" was made apprised of the various issues at hand.

396. This concerted behavior between the "department" and the Defendant led to Plaintiff and the other complainants receiving findings of Lack of Substantial evidence; despite the "department" being presented with direct conflicting information to Defendant's position or verified statements specifically from Defendant's: website, employee LinkedIn pages, business records, policies, procedures and the like.

397. Plaintiff and his attorney, as well as, others and their attorney were not allowed to cross examine the witnesses during the fact finding conference and were not even allowed to participate when the investigator interviewed witnesses by telephone or in person.

398. The "department" and defendant knew that an adverse finding of lack of Substantial Evidence for Plaintiff and other complainants would cause Plaintiff and others irreparable harm, increased emotional and physical stress, duress, cost and continued financial burdens.

399. The 'department's" protocol is that the investigator completes the investigation, the supervisor reviews the work and the work is presented to legal.

400. The 'department" internally cross-referenced the charges filed by complainants against Defendant including, Plaintiff's.

401. Plaintiff and others assert that the department was apprised of the numerous charges filed by more than 20 persons against defendants.

402. Plaintiff asserts that these persons took off work and drove well over 60-70 miles from where they lived to downtown Chicago to file these charges.

403. Any reasonable person would have concluded that there was an issue with Defendants, especially if more than 20% of the workforce filed complaints.

404. Plaintiff and others believe that the "department" and its staff did not uphold their fiduciary obligations.

405. Plaintiff and others believe that the "department's" depraved contrary custom and blatant disregard for public policy encouraged Defendants to further it schemes without reprisal.

406. Plaintiff and others believe that the "department" aided and abetted Defendants in the violation of Plaintiff and others protected rights.

407. Plaintiff and others believe that the "department" was a willful participant in Defendants malicious scheme.

408. Plaintiff and others believe that the "department" knew that not following its policies would intentionally and willfully inflict and cause emotional distress and harm, as it had been mandated amongst other things to not make credibility determinations.

409. Plaintiff and others believe that the "department's" intentional, woeful and willful disregard of its own policies was one of the drivers in Defendant's actions that led Plaintiff's and others rights to be continual deprived by both the defendant and the "department."

410. The "department" is under an injunction not to make credibility determinations.

411. The "department" disseminates as a matter of course of ordinary business that it is under an injunction not to make credibility determinations; specifically, *The Cooper v. Salazar* injunction, #98 C 2930, U.S. District Court for the Northern District of Illinois, Order dated November 1, 2001.

412. Plaintiff and others established conflicting evidence with the "department" in regards to Defendants, as well as, proffered supporting business records and witnesses.

413. The "department" made numerous credibility determinations as it relates to Plaintiff and other complainants.

414. Plaintiff and others believe that the "department" has an unconstitutional policy because either the "department" has failed to train its employees or an authorized person instructed its

employees/subordinates to do otherwise or the "department" blatantly disregarded the mandates and/or a combination of such.

415. The actions of the "department" making credibility determinations deterred the majority of complainants from pursing the matter beyond the "department."

416. One complainant, Scott Marksteiner, from the Mars Manteno facility at the "department" loss his life to due to the disparate and disparaging treatment imposed upon him by Defendants for opposing the disparate and disparaging treatment of African-Americans.

417. The "departments" actions aided defendant in continuing to subjugate Plaintiff and others to a hostile and animus work environment, as well as, adverse terms and conditions of employment, retaliation, harassment, ostracism, bullying, and other forms of disparate and disparaging treatment.

418. Defendants intentionally misrepresented to Plaintiff his job's compensation and that they were in compliance with TYSON's return to work requests. This was not the case.

419. Moreover, TYSON alleges that other similarly situated, non-black, non-African American co-workers were not subjected to such treatment.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests that the Court:

**That** a declaratory judgment against Defendants be entered that Defendants violated TYSON's right to be free from discrimination in the workplace and intentional racial discrimination pursu-

ant the Civil Rights Act of 1866, as amended by the Civil Rights Act of 1991, 42 U.S.C. §1981; 42 U.S.C. §1981A.

**That** an entry of an injunction ordering Defendants to make TYSON whole with full back pay, benefits and front pay;

**That** TYSON be awarded compensatory damages in an amount to be shown at trial for past and future economic and non-economic losses, including extreme emotional distress and mental anguish, impairment of the quality of life; and consequential loses;

**That** TYSON be awarded exemplary and/or punitive damages in an amount shown at trial;

**That** TYSON be awarded reasonable attorneys' fees and costs, including but not limited to expert witness fees, as provide;

**That** TYSON be awarded interests on any awards at the highest rate allowed by law; and

**That** such other and further relief that this Court deems just and appropriate to be determined by a jury;

## PLAINTIFF DEMANDS A TRIAL BY JURY ON ALL COUNTS

Respectfully Submitted this ⑩ Day of May 2019 by:

Morris TYSON
P.O. Box 55
Steger, IL 60475
815-295-4592
Morris60901@yahoo.com

Jun 15 15 05:29p    Home                    8155237139       p.2



May 26, 2015

Exel
1263 Windham Parkway
Romeoville, IL
60446

Telephone 630.771.0667
Facsimile 630.771.0490

www.exel.com

Mr. Morris Tyson
P. O. Box 291
Kankakee, IL 60901

Dear Morris:

We are in receipt of the Interactive Process Questionnaire that was completed by Doctor Wesley Choy on May 4, 2015. Per his report you have a permanent restriction of a 25 pound weight limit and no repetitive activity with your left hand. As we discussed in our meeting with Kim Daniels and Chris Moncrief on May 13, 2015, Exel is not able to accommodate these permanent restrictions in your position as a Yard Driver / Fork Lift Operator. Therefore, as discussed you were separated from employment effective the end of your shift on May 13, 2015.

If you were enrolled in Be Secure Benefits, you will receive paperwork at your home that will provide information on your eligibility to continue healthcare coverage through COBRA.

As we also discussed, if at any time the restrictions are lifted, you are eligible to apply for reemployment under Exel's rehire policy.

Please feel free to call me with any questions or concerns you have.

Sincerely,

Karol A. Boyd
Area Human Resources Manager

Karol.Boyd@Exel.com
Tel    630.771.0667 ext. 20928
Fax    630.771.0490
Mobile  630.930.2217

EXHIBIT
1-5

Raising expectations.



| Document Number: ISO-BP-4.2.3.001 | Title: CONTROL OF DOCUMENTS | | | |
|---|---|---|---|---|
| Original Date: 04/07/06 | Revision Date: 07/16/12 | Revision #: 1 | Effective Date: 08/01/12 | 1 of 8 |

Author: Quality Assurance and Regulatory Affairs Director, Best Practices/Date

_(signature)_ 07/17/12

Approval: QC, Best Practices/Date

_(signature)_ 07/17/12

Approval: VP, Best Practices/Date

_(signature) Jason J. Minghini_ 07/17/12

## 1.0 PURPOSE / SCOPE

The purpose of this document is to identify actions and responsibilities for ensuring the control of all quality documents pertaining to Kenco's Quality Management System (KQMS).

This document applies to all Kenco functions and operations and encompasses all internal and external documents used to manage, perform, or verify work including those included at the top tier level as Policies (POLs), Control Procedures (CPs), Best Practices (BPs), ISO Control Procedures (ISOs), Rivermill Procedures (RMPs), and at the site level in Quality Plans (QPs), Standard Operating Procedures (SOPs, Work Instructions (WIs), Standard Work (SW), and Forms.

## 2.0 ROLES AND RESPONSIBILITIES

**Kenco Management Services (KMS) – Best Practices** – has overall responsibility for the document control system, including the issuance and maintenance of this procedure. KMS-Best Practices controls and maintains all electronic information systems and the distribution, as well as, both hard copy and electronic copies of Policies (POL), ISO Control Procedures (ISO), Control Procedures (CP), Best Practices (BP), and Rivermill Procedures (RMP). All proposed changes and other suggestions for improvement of these procedures can be submitted online via the kencoconnection.com page.

**Site Quality Coordinator** – controls and maintains all electronic information systems and the distribution of related information, as well as, both hard copy and electronic copies of the Site Quality Manual, all SOPs, Job Descriptions (JD), and all forms ( and formats) used to create quality records.

**Designated Approval Authorities** – responsible to approve, reapprove and ensure adequacy of documents prior to release.

**Site Managers** – ensure conformance to this procedure at their site.

**All Associates** – are responsible to understand the structure and process of the Control of Documents Control Procedure.

_Proprietary Information - Kenco_


EXHIBIT



| Document Number: | Title: | | | |
|---|---|---|---|---|
| **ISO-BP-4.2.3.001** | **CONTROL OF DOCUMENTS** | | | |
| Original Date: | Revision Date: | Revision #: | Effective Date: | 2 of 8 |
| **04/07/06** | **07/16/12** | **1** | **08/01/12** | |

## 3.0 POLICY

3.1 The primary objective of the document control process is to ensure that documents are available to achieve the desired results. Document control is a critical factor in achieving standardization and measurement to achieve customer satisfaction, process effectiveness and improvement. The document control process provides adequate control for all documents and media, including hard copy, firmware, and software control.

3.2 KMS-Best Practices controls, maintains, and distributes Quality Management system (QMS) documentation via kencoconnection for POLs, ISOs, CPs, BPs, and RMPs.

3.3 POL, ISO, CP, BP, and RMP documents are approved for adequacy prior to release for use by a cross-functional panel called the Quality Review Board (QRB). Records of signed approvals are maintained by KMS-Best Practices.

3.4 The sites control, maintain, and distribute all customer-provided and site generated documents such as quality plans, related inspection/test procedures, specifications, etc., including all QPs, SOPs, WIs, SW, JDs, Forms, or other documents as defined by the customer or site needs.

3.5 Site documents are approved for adequacy by the Site Manager and Quality Coordinator (QC) prior to release, and personnel are trained after approval but before the documents are effective.

3.6 Approved Author Groups will review top tier documents annually, and the documents are reviewed for policy and accuracy, availability and legibility. All document updates and changes are approved prior to re-issue.

3.7 Site leadership will review site documents annually, and the documents are reviewed for process accuracy, availability and legibility. All document updates and changes are approved prior to re-issue.

3.8 External documents are identified on Appendix B and their distribution controlled.

3.9 Records are a special type of document and are controlled in accordance with provisions contained in this procedure and *ISO-QE-4.2.4.001 Control of Records*.

3.10 Obsolete documents are processed and maintained as described in Section 4.7 of this procedure.

## 4.0 PROCEDURE

4.1 Documents will be identified with a unique identification number including the date of issue, which indicates the revision, appearing on all pages of the document.

4.2 **Identification of Top Tier Procedures**

*Proprietary Information - Kenco*



| Document Number: ISO-BP-4.2.3.001 | Title: CONTROL OF DOCUMENTS | | | |
|---|---|---|---|---|
| Original Date: 04/07/06 | Revision Date: 07/16/12 | Revision #: 1 | Effective Date: 08/01/12 | 3 of 8 |

**4.2.1** Documents including POLs, BPs, CPs, ISOs, and RMPs will be identified with a unique identification number including a 2-digit code which indicates the approved author group which created the document.

**4.2.2** The document number will be numbered as: _____. For example: The _____ written by _____ discussing _____ would be: - - _____.

**Note:** Forms add a dash then a number to the document number which relates to them. The training form for the above procedure would be - - _____ -1.

**4.2.3** The _____ would be _____ for Policies, _____ for ISO Procedure, _____ for Control Procedure, _____ for Best Practices or _____ for Rivermill Procedure.

**4.2.4** The _____ from the list below will follow the document type:

| Approved Author Groups | Code |
|---|---|
| Best Practices | BP |
| Executive Management | EM |
| Finance | FN |
| Human Resources | HR |
| Internal Communications | IC |
| Insurance | IN |
| Information Technology | IT |
| Logistics Engineering | LE |
| Legal | LG |
| Operations | OP |
| Procurement | PO |
| Quality Engineering | QE |
| Risk Management | RM |
| Sales/Marketing | SA |
| Training | TR |

**4.2.5** The _____ will follow the _____. Consult the "Cracking the Case of ISO 9001:2008 for Service" book by Cianfrani and West.

**4.2.6** To find the next _____ for a given ISO Clause, the QC must view the complete document list for their Author Group.

**4.2.7** **ISO Procedures (ISO)** – ISO Procedures are procedures developed by KMS-Best Practices Department that directly controls the KQMS. These ISO procedures are identified as ISO-BP-##. An example can be found in the header of this document.



| Document Number: ISO-BP-4.2.3.001 | Title: CONTROL OF DOCUMENTS | | | |
|---|---|---|---|---|
| Original Date: 04/07/06 | Revision Date: 07/16/12 | Revision #: 1 | Effective Date: 08/01/12 | 4 of 8 |

**4.2.8** **Rivermill Procedures (RMP)** – Rivermill Procedures are documents developed by approved author groups that only apply to the Rivermill office. These procedures will be identified as RMP-(Author Group Code)-##.

**4.2.9** **Best Practices (BP)** – Best Practices are documented practices that provide guidance to sites in the development of SOPs. The sites must address the content of these documents in their procedures, however, the BPs themselves are not retained by the sites. All Best Practices are identified as BP-(Author Group Code)-##.

**4.2.10** **Control Procedures (CP)** – Control Procedures are directives. These procedures will be identified as CP-(Author Group Code)-##.

**4.2.11** **Policies (POL)** – Policies are documents developed by approved author groups describing general principles and identified as POL-(Author Group Code)-##.

**4.3** **Numbering Identification of Site Documents**

**4.3.1** The document number will be numbered as:
. For example: The third        written discussing
would be:        -        .

Note: Forms add a dash then a number to the SOP number which relates to them. The training form for the above procedure would be        -        -1.

**4.3.2** The Document Type would be SOP for Standard Operating Procedure or JD for Job Description, WI for Work Instruction, SW for Standard Work, etc.

**4.3.3** The appropriate ISO Clause follows the Document Type: Consult the "Cracking the Case of ISO 9001:2008 for Service" book by Cianfrani and West.

**4.3.4** To find the next Sequential Document Number for a given ISO Clause. The QC must view the complete document list for their site.

**4.3.5** **Standard Operating Procedures (SOP)** – SOPs will be identified as SOP ## with the number of the SOP corresponding to the associated Site Quality Plan (SQP) clause. For example: "SOP-6.2.2.001 indicates the SOP corresponds to Clause 6.2.2 of the site's SQP and is procedure 001.

**4.3.6** **Job Descriptions (JD)** – JDs will be identified as JD-5.5.1.## with the number of the JD corresponding to the associated SQP 5.5.1 Clause (Responsibility and Authority). For example, "JD-5.5.1.001" indicate the first JD in the system.

*Proprietary Information - Kenco*



| Document Number: ISO-BP-4.2.3.001 | Title: CONTROL OF DOCUMENTS | | | |
|---|---|---|---|---|
| Original Date: 04/07/06 | Revision Date: 07/16/12 | Revision #: 1 | Effective Date: 08/01/12 | 5 of 8 |

**4.3.7** All forms applicable to a document will be identified as ‑[Form Number]. **Effective Date** in the footer at the bottom of the form. For example: ‑2 **Effective 04/01/08**. This example is the second form attached to ‑ and was **last revised on 04/01/08**. The identification number, effective date of issue or revision date will be shown on all pages of documents.

**4.4 Document Approval** – The first page of each document will identify:

**4.4.1** The Author as the Subject Matter Expert that is responsible for developing the document or changes.

**4.4.2** The QC as the reviewer/approver responsible for its periodic review for compliance with KQMS requirements, consistency with established policy and objectives, update and maintenance.

**4.4.3** The relevant approval authority (i.e. VPs or Directors are assigned approval authority for top tier documents, Site Manager is assigned overall responsibility in the QP for managing the process and authorizing release of site documents).

**4.5 Master Lists** – At a minimum, the following master lists will be established and maintained. These lists must contain a date identifying when the list was last updated:

**4.5.1** A master list of Site KQMS Documents (SOPs, JDs, WIs, and SW) is maintained as Appendix "A" of the QP.

**4.5.2** A master list of all external documents, customer procedures and manuals are maintained in Appendix "B" of the QP.

**4.5.3** A master list of quality plans, specifications, and related inspection/test procedures are maintained in Appendix "C" of the QP.

**4.5.4** A master list of exceptions to top tier documents is maintained in Appendix "D" of the QP. Exceptions are obtained per instructions in *CP-BP-4.2.1.001 QMS Documentation*.

**4.5.5** A master list of site distribution of manuals is maintained in Appendix "E" of the QP.

**4.5.6** A master list of Control Procedures is maintained by KMS-Best Practices and the sites print this as Appendix "F" of their QP.

**4.5.7** A master list of records is recorded in the Index of Quality Records. Reference *ISO-QE-4.2.4.001 Control of Records*.

**4.6 Document Issue and Retrieval**

*Proprietary Information - Kenco*



| Document Number: ISO-BP-4.2.3.001 | Title: CONTROL OF DOCUMENTS | | | |
|---|---|---|---|---|
| Original Date: 04/07/06 | Revision Date: 07/16/12 | Revision #: 1 | Effective Date: 08/01/12 | 6 of 8 |

**4.6.1** Hard copy master signed originals of all controlled documents will be identified with original signature and dates of the relevant approval authority. Controlled copies will be clearly identified with a red ink stamp identifying the document as a "CONTROLLED COPY". A controlled copy stamp signifies the QC guarantees that the controlled copy is identical to the master signed copy.

**Note:** Controlled copy stamps may only be applied to documents which the QC is in possession of master signed copies (in indelible ink). Verification of accuracy of controlled copies cannot be guaranteed without physical comparison to the master site copy.

**4.6.2** Uncontrolled copies may be made, but the recipient of these documents must be advised that they are for information only and cannot be guarantee of their accuracy once copied.

**4.6.3** Sites that must maintain compliance of documentation for regulatory agencies, [i.e. Food and Drug Administration (FDA)] will be provided current controlled copies of ISOs and CP-QE/BPs from Best Practices. Best Practices and site's QCs will complete *ISO-BP-4.2.3.001-3 Controlled Copy Distribution Form* as controlled copies are distributed, obsolete, and destroyed.

## 4.7 Document Changes

**4.7.1** KMS-Best Practices uses a *Document Change Notice (DCN) ISO-BP-4.2.3.001-1* to request and document any changes to the POL, BP, CP, RMP or forms.

**4.7.2** Sites use a DCN to request and document any changes to QPs, SOPs, WIs, SW, JDs, or forms.

**4.7.3** The following steps describe how to use DCNs in the internal document change control process:

**4.7.3.1** The personnel requesting a document change completes the applicable part of the DCN and forwards the DCN to the QC.

**4.7.3.2** The QC will review the recommended change to the document and submit to the relevant approval authority with related comments concerning any policy or procedural issues. The QC will keep a log of the DCN to track the progression of the document change process. See *DCN System Control Log (ISO-BP-4.2.3.001-2)*.

**4.7.3.3** The QC will keep their DCN Log up-to-date in their Quality folder on the Kenco network drive, or if no access is available they will send a copy of the DCN Log to KMS-Best Practices on the first Tuesday of every month.

**4.7.3.4** The relevant approval authority will utilize SMEs to determine if the change is required, effectiveness of the change, safety issues and possible related processes that may be affective by the change. Once the SME has completed the determination and adjusted the content of the document back to the approval authority for final review.



| Document Number: | Title: | | | |
|---|---|---|---|---|
| ISO-BP-4.2.3.001 | CONTROL OF DOCUMENTS | | | |
| Original Date: | Revision Date: | Revision #: | Effective Date: | 7 of 8 |
| 04/07/06 | 07/16/12 | 1 | 08/01/12 | |

**4.7.3.5** If the relevant approval authority decides to implement the proposed change, they will approve the DCN and return it along with any related comments and recommendations to the QC for preparation of a final "ready for signature" copy of the revised document.

**4.7.4** Upon receiving the approval authority signature, the QC will:

    **4.7.4.1** Change the appropriate portion of the document. The revised document must be reissued in its entirety.

    **4.7.4.2** Update the Revision Date, Revision #, and Effective Date in the header of the document.

    **4.7.4.3** Submit the "ready for signature" copy of the document to the author for signature as the SME of the process.

    **4.7.4.4** Submit the "ready for signature" copy of the document to the relevant approval authority for signature. The approval authority will verify the accuracy and legibility of the document before approving. The QC must also approve the document.

    **4.7.4.5** Reissue the document in its entirety. The revised documents may be accompanied by a memo summarizing the nature of the change or providing instructions regarding disposition of obsolete documents or pages.

    **4.7.4.6** Retrieve the obsolete controlled document(s).

    **4.7.4.7** Archive the obsolete master (signed) controlled document and file with the DCN (destroy the obsolete controlled copies).

    **4.7.4.8** Update the applicable master list.

    **4.7.4.9** Coordinate with the designated trainer to ensure the timely provision of needed training if deemed necessary, (i.e. the change impacts the policy or procedure). Simple grammatical or typographical changes (administrative changes) do not require training.

**4.7.5** If the relevant approval authority decides not to implement the proposed change, they will reject the DCN and contact the originator with an explanation.

    • If the originator chooses to dispute the rejection, they can submit the DCN and any related comments to the QC for mediation. If the QC rejects the DCN, the rejection will be communicated to the relevant approval authority and originating associate. If the QC determines that the proposed change (or a modified version of the initial proposed change) merits further review, they will initiate a new DCN and forward it to the relevant approval authority with related comments and recommendations.

*Proprietary Information - Kenco*



| Document Number: ISO-BP-4.2.3.001 | Title: CONTROL OF DOCUMENTS | | | |
|---|---|---|---|---|
| Original Date: 04/07/06 | Revision Date: 07/16/12 | Revision #: 1 | Effective Date: 08/01/12 | 8 of 8 |

## 5.0 REFERENCES

*CP-BP-4.2.1.001 QMS Documentation*
*ISO-BP-4.2.3.001-1 DCN Change Notice Form*
*ISO-BP-4.2.3.001-2 DCN System Control Log*
*ISO-BP-4.2.3.001-3 Controlled Copy Distribution List*
*ISO-QE-4.2.4.001 Control of Records*

## 6.0 REVISION TABLE

| Revision # | Revision Date | Description |
|---|---|---|
| 0 | 04/07/06 | Document created. |
| 1 | 07/16/12 | Complete revision. |



# Job Analysis: How do I conduct a job analysis to ensure the job description actually matches the duties performed by the employee in the job?

May 31, 2012

Job descriptions are used for a variety of reasons. They are a tool for recruiting, determining salary ranges and levels or grades, establishing job titles, creating employee's job goals and objectives, and conducting performance reviews. They can also be used for career planning, creating reasonable accommodations and meeting legal requirements for compliance purposes. Because of this, it is very important to have written job descriptions that accurately reflect the employees' current job duties and responsibilities.

Employers should audit their job descriptions every few years, usually in conjunction with a compensation study and whenever the organization's purpose, mission or structure changes. One way to audit or create job descriptions is to conduct a job analysis. Job analysis is the process of gathering, examining and interpreting data about the job's tasks and responsibilities. It generally includes tracking an employee's duties and the duration of each task, observing the employee performing his or her job, interviewing the employee, managers and others who interact with the employee, and comparing the job to other jobs in the same department and job grade or job family. An important concept in job analysis is that it is an evaluation of the job, not the person doing the job. The final product from a job analysis includes a thorough understanding of the essential functions of the job, a list of all duties and responsibilities, a percentage of time spent for each group of tasks, the job's relative importance in comparison with other jobs, the knowledge, skills and abilities (KSAs) needed to perform the job, and the conditions under which the work is completed.

There are many ways to perform a job analysis, but all require the cooperation of the employee in the position, his or her manager(s) and others the employee must work closely with while performing his or her job duties.

The following steps will help provide the best analysis of a particular job:

1. Involve employees by having them complete job analysis forms.
2. Interview employees, asking them specific questions about their job duties and responsibilities.



EXHIBIT

3. Obtain log sheets from employees with information about each of their tasks and the time spent on each task for at least one full work week.

4. Complete desk audits where you observe employees doing their jobs at different times of the day and days of the week and track what they do and for how long.

5. Interview supervisors and managers, and other employees, clients and customers the employee may interact with while performing the job.

6. Compare the job to other jobs in the department as well as the job grade or job family to show where it falls on the pay scale.

If there is more than one person doing the same job, make sure to observe and obtain feedback and information from more than one person. You will want to review your findings with the employees who do the job as well as their supervisors and managers to tweak your findings until you have an accurate reflection of the job duties and responsibilities.

Sample job analysis forms may be found at:

http://www.shrm.org/TemplatesTools/Samples/HRForms/Articles/Pages/CMS_001973.aspx (www.shrm.org/TemplatesTools/Samples/HRForms/Articles/Pages/CMS_001973.aspx)

http://www.shrm.org/TemplatesTools/Samples/HRForms/Pages/JobAnalysisForm.aspx (www.shrm.org/TemplatesTools/Samples/HRForms/Pages/JobAnalysisForm.aspx)

http://www.shrm.org/TemplatesTools/Samples/HRForms/Articles/Pages/CMS_011001.aspx (www.shrm.org/TemplatesTools/Samples/HRForms/Articles/Pages/CMS_011001.aspx)

### Express Requests

The HR Knowledge Center has gathered resources on current topics in HR management. Click here (www.shrm.orghttp://apps.shrm.org/HRResources/ExpressRequests.aspx?type=6) to view and request information.

*All of the content on this page, including content associated with Express Requests, is for informational purposes only and not for the purpose of providing legal advice. You should always contact your attorney to determine if this information, and your interpretation of it, is appropriate to your particular situation.*

Contact Us (www.shrm.org/about-shrm/Pages/Contact-Us.aspx) | 800.283.SHRM (7476)

2017 SHRM. All Rights Reserved

SHRM provides content as a service to its readers and members. It does not offer legal advice, and cannot guarantee the accuracy or suitability of its content for a particular purpose.

Disclaimer (www.shrm.org/about-shrm/Pages/Terms-of-Use.aspx#Disclaimer)

Tuesday, May 14, 2013 10:34:12 AM ET

**Subject:** Re: Signing Incentive for Mars Employees
**Date:** Thursday, March 7, 2013 12:58:24 PM ET
**From:** Caines, David
**To:** Craig, Judy
**CC:** Hise, Paula

No worries. Makes sense and the impact to us is smaller so I'm fine.

David Caines
President

Kenco Logistic Services
2001 Riverside Drive
Chattanooga, TN 37406
tel: +1 (423) 605 8009
david.caines@kencogroup.com

On Mar 7, 2013, at 12:10 PM, "Craig, Judy" <Judy.Craig@Kencogroup.com> wrote:

> Oh boy, David. I need to retract some of this. Can we review this afternoon. The revision should be:
>
> $97,000 was added to Mars Operating Budget by Kenco to cover the 90 day waiting period. Of that, Mars will pay $49,457 to cover Starbridge for the employees. That leaves $47,544 of the $97K from Mars and Kenco will add the same, $47,544, to total $95,000 for the signing incentive for the employees. The (5 divided by 72 is a rough $1,300.00 per employee or $433.00 for the 3 payment.
>
> Kenco's portion is $47,544 and the employees get $433.00 per month for the months.
>
> I am so sorry for the confusion...
>
> <F68F1FFC-87DC-4FA2-9974-892728296323[8].jpg>
>
> **From:** <Caines>, David Caines <david.caines@Kencogroup.com>
> **To:** Judy Craig <judy.craig@kencogroup.com>
> **Cc:** Paula Hise <Paula.Hise@Kencogroup.com>
> **Subject:** Re: Signing Incentive for Mars Employees
>
> So $590 per employee (72 total employees) paid out at the 30-60 & 90 day marks?
>
> Assuming this is correct . . . How much of the $127K are we covering & how much is covered by MARS?

David Caines



EXHIBIT

President
Office: 423-643-3426
Mobile: 423-605-8009
Email: david.caines@kencogroup.com

Kenco
2001 Riverside Drive
Chattanooga, TN 37406
www.kencogroup.com

*The information contained in this electronic communication and any accompanying document is confidential and is intended only for the use of the addressee. It is the property of Kenco. Unauthorized use, disclosure or copying of this communication, or any part of it, is strictly prohibited and may be unlawful. If you have received this communication in error, please notify the sender immediately by return email, and destroy this communication and all copies of it, including all attachments. Electronic communication may be susceptible to data corruption, interception and unauthorized tampering and Kenco disclaims all liability of any kind for such actions or any consequences that may arise directly or indirectly therefrom.*

**From:** <Craig>, Judy Craig <Judy.Craig@Kencogroup.com>
**Date:** Wednesday, March 6, 2013 5:04 PM
**To:** David Caines <david.caines@kencogroup.com>
**Cc:** Paula Hise <Paula.Hise@Kencogroup.com>
**Subject:** Signing Incentive for Mars Employees

Hi David,
The transition is going well so far! Hope all is well with you!

We'd like show you the final on the signing incentive structure for approval before we show the final to Mars. This signing incentive was to help employees who transfer from 4T's bridge the gap of expenses in the Kenco 90 day benefits waiting period. They can use it for whatever they like and it will be paid in 30 day increments over the first 90 days of employment with Kenco. It will be for 4T's employees who transition to Kenco, only.

Here is the history. In our first estimate, the signing incentive we presented to Mars for them to pay was $177,000. We put it in their start up fees, but then they came back and asked us to help them with this as it was making us not competitive with the other bidders. We then talked with you and Sean and from those conversations we would add the cost of benefits to our operating budget as if Mars was paying for full benefits from day 1, and Kenco would handle the signing incentive. This worked for Mars so the operating budget to Mars for the day 1 – 90 benefits expense was increased by $97,000. We won the business.

Last week, 4T's announced they would not be able to cover COBRA, so our solution was that Kenco would offer Starbridge insurance to the employees for the first 90 days to help them bridge insurance until their Kenco benefits kicked in. The Starbidge cost will be $49,457.00 if all take it. What we now need to do before we begin the employee interview process is to have Mars see how much the signing incentive will be for the employees and the calculations.

Starbrige will not be provided to temporary labor at the DC.

Original Estimate $177,000 ; Amount Added to Mars Proforma Operating Expense - $97,000.00; Kenco To Pass to Employees - $80,000.00

Mars Pass Thru in Operating Expenses in Proforma: $97,000.00
Mars to pay for Starbridge from the $97K:      -$49,457.00
Balance Kenco to Pass thru to Mars:      $47,544.00 +

Kenco To Pass to Employees: $80,000.00
Total to be presented to Employees$127,544 to 72 employees or $1770.00 per person if hired by Kenco as a signing incentive.

The employee must pass the background and drug screen. The first payment is after the first 30 days.

The original estimate was about $1999.00 per person, so this is a little less, but close.

Please let me know if okay or if changes are needed. I'm in the office tomorrow or you can reach me by cell tonight.

Thanks so much.


<F68F1FFC-87DC-4FA2-9974-892728296323[10].jpg>

AOL Mail - Message View

Page 1 of 2

< 277 Results for edith

**FW: Employee Relations Announcement**

From: Madison, Mary <Mary.Madison@Kencogroup.com>
To: lagniappe26 <lagniappe26@aol.com>
Date: Fri, Aug 9, 2013 9:42 am

📎 Copy of KLS Org Char...pdf (183 KB)

Thank you kindly,

Mary Madison
Quality Engineer

Kenco/Mars
1125 West Sycamore Road
Manteno, IL 60950
815.468.4448
www.Kencogroup.com

This message and any attachments are intended only for the use of the addressee and may contain information that is privileged and confidential. If the reader of the message is not the intended recipient or an authorized representative of the intended recipient, you are hereby notified that any dissemination of this communication is strictly prohibited. If you have received this communication in error, notify the sender immediately by return email and delete the message and any attachments from your system.

From: McCurry, Edith
Sent: Monday, July 08, 2013 7:59 PM
To: Madison, Mary
Subject: FW: Employee Relations Announcement

Edith McCurry

Kenco Logistics Services
1125 Sycamore Rd
Manteno, IL 60950
www.kencogroup.com
Email: Edith.McCurry@KencoGroup.com
Office 815-466-9999, X464
Fax 1-815-468-2468

From: Register, Eddy
Sent: Friday, June 28, 2013 9:07 AM
Cc: Tate, Tammie; Fowler, Tammi; Register, Eddy
Subject: Employee Relations Announcement

All,

The Human Resources department has restructured the site reporting responsibility for all Employee Relations concerns/issues. Currently, Tammi Fowler is the Senior Manager of Employee Relations for all sites and Tammie Tate is the Senior HR Manager for the Stryker and Whirlpool accounts. To ensure that all of our sites continue to receive exceptional support and guidance from the HR department, we have reallocated their areas of responsibility. I have attached a chart which details the specifics of the new reporting structure.

With these changes and the addition of Marti Donovan to the HR team, we will better equipped to meet your Employee Relations needs and provide outstanding support to all of our sites. These changes will be effective July 1, 2013. Tammi Fowler, Tammie Tate, and Marti Donovan will report directly to the VP of Human Resources.

Please do not hesitate to contact me if you have any concerns and or questions about the new structure.

Regards,

**Eddy Register**
**Director of Recruiting & Development**
**Kenco Human Resources**

**Kenco Management Services, LLC**
**P.O. Box 1607**
**2001 Riverside Drive (37406)**
**Chattanooga, TN 37401**
**Phone: 423-643-3335**
**Fax: 423-643-3325**
www.kencogroup.com



EXHIBIT

4/6/2016



**Rebekah Funk**

| | |
|---|---|
| **From:** | Manzello, Mike <Mike.Manzello@Kencogroup.com> |
| **Sent:** | Wednesday, June 11, 2014 8:25 AM |
| **To:** | Moore, Todd; Coffey, Robert; Hise, Paula; Jabaley, David; McCauley Greg |
| **Subject:** | RE: Inbound plan |

At this time Todd we are in the interview process for our 2ⁿᵈ 3ʳᵈ shift spotter.

**Mike Manzello**
Operations Manager
1125 Sycamore Rd • Manteno, IL 60950
Office: 815-468-4404 • Mobile: 815-342-9484

 **VOTE
KENCO
A TOP 3PL**
*We can't do it without you.*

 

*The information contained in this electronic communication and any accompanying document is confidential and is intended only for the use of the addressee. Unauthorized use, disclosure or copying of this communication, or any part of it, is strictly prohibited and may be unlawful. If you have received this communication in error, please notify the sender immediately by return email, and destroy this communication and all copies of it, including all attachments.*

**From:** Moore, Todd [mailto:todd.moore@effem.com]
**Sent:** Wednesday, June 11, 2014 6:51 AM
**To:** Manzello, Mike; Robert Coffey; Hise, Paula; Jabaley, David; McCauley Greg
**Subject:** RE: Inbound plan

All-
Please work with your team or the spotting service (don't exactly recall how your site operates) to have multiple people certified with the spotting service skills. This amount of downtime on the spotter will cripple a DFC. Please advise the plan ASAP.
Todd

**From:** Manzello, Mike [mailto:Mike.Manzello@Kencogroup.com]
**Sent:** Tuesday, June 10, 2014 10:27 AM
**To:** Coffey, Robert; Moore, Todd; Hise, Paula; Jabaley, David; McCauley Greg
**Subject:** Inbound plan

Hello All


EXHIBIT
6 - 10

As you have seen we are at 50 inbounds in the yard at this time. We did have a miss last night with a spotter leaving at 1 a.m.. The backup spotter couldn't make it in until 5 a.m. but we went ahead and picked into first shifts picks allowing first shift to focus more on the inbounds. Over the course of the week, we are posting 10 hr. days to bring this inbound

1

DEF003197

number down. With the 50 inbounds that we have at the moment and predicting 120 to come in over the next three days. I have the building focusing 60 inbounds a day to bring us back in line by Friday with the inbounds.

**Mike Manzello**
Operations Manager
1125 Sycamore Rd • Manteno, IL 60950
Office: 815-468-4404 • Mobile: 815-342-9484





The information contained in this electronic communication and any accompanying document is confidential and is intended only for the use of the addressee. Unauthorized use, disclosure or copying of this communication, or any part of it, is strictly prohibited and may be unlawful. If you have received this communication in error, please notify the sender immediately by return email, and destroy this communication and all copies of it, including all attachments.

DEF003198

LEN SZPLETT

**IA CARD SERVICES™**

**Prudential Financial**

July 18 - August 19, 2014
Page 3 of 4

| Transaction Date | Posting Date | Description | | | Reference Number | Account Number | Amount | Total |
|---|---|---|---|---|---|---|---|---|
| | | **Purchases and Adjustments** | | | | | | |
| 07/22 | 07/23 | CRAIGSLIST.ORG | 04155666394 CA |  S patten ad | 5221 | 2343 | 25.00 | |
| 08/01 | 08/02 | CRAIGSLIST.ORG | 04155666394 CA | for Kemco | 2391 | 2343 | 25.00 | |
| | | | |  re-imburse me | | | | $50.00 |

Page 1 of 1

Conr

Case

Cour



14    005701

EXHIBIT

Quick Notes Page 2

**4 T's MANAGEMENT**
1125 Sycamore Road/Manteno, IL 60950
Tel. 815-468-9999 • Fax 815-468-1979



SUBJECT:    CMV Driver Transfer

REFERENCE:    Morris Tyson
S.S.

TO WHOM IT MAY CONCERN:

This letter is to certify that Morris Tyson has transferred from 4T's Mgmnt. to Kenco Logistic Services on April 21, 2013 at which time Kenco assumed the warehouse contract at the Mars facility in Manteno, IL. This is an operation conducted on private property with unlicensed power units.

The above named driver was hired on 1-19-2004 by 4T 's Mgmnt. and has been re-qualified as a Spotter Driver for Kenco Logistic Services, LLC. He successfully completed driver background evaluations, a Pre-Employment Drug Screen and DOT Physical. He is being placed in the Kenco Management Services company random drug and alcohol testing program. Kenco Management Services Risk Management will be maintaining his file according to KQMS Controlled Procedures.

Has this driver had any of the following during his employment?

| | |
|---|---|
| Alcohol test with a result of 0.04 or higher alcohol concentration? | No |
| Verified positive drug tests? | No |
| Refusals to be tested (including verified adulterated or substituted drug test results) | No |

Has this driver been involved in any commercial motor vehicle accidents?    No
If yes list below:

| Date | Type of accident | Preventable or Non-Preventable |
|---|---|---|
| | NONE | |

Sincerely,

Len Szplett

Len Szplett
Kenco Logistic Services, LLC
Office Manager
(formerly from 4T's Management)

TRAILWOOD WAREHOUSE, LLC    TRAILWOOD TRANSPORTATION, INC.    TRAILWOOD WAREHOUSE, LLC    TYSON MISCO/ERIN    TYSON WAREHOUSE, LLC    TYSON PENNSYLVANIA
ST. PAUL, MN 55108    MOUNDS VIEW, MN 55112    NEW BRIGHTON, MN 55112    MILWAUKEE, WI 53207    TYSON TRUCK LINES, LLC    DISTRIBUTION CENTER
813-783-2013    612-783-9698    612-783-2043    414-747-8403    7 T'S MANAGEMENT, LLC    1490 ZEAGLER ROAD
612-645-5744 FAX    612-783-2256 FAX    612-633-8842 FAX    414-747-6430 FAX    MOUNDS VIEW, MN 55112    ELIZABETHTOWN, PA 17022
    612-785-9699    717-367-7161 • 717-347-9632 FAX
    519-765-9048 FAX



EXHIBIT

McCurry, Edith

**From:** Moore, Suzanne
**Sent:** Friday, August 23, 2013 7:58 AM
**To:** McCurry, Edith; Phillips, Cathy; Szplett, Len
**Subject:** RE: Employee Morris Tyson status

Thank you – I will get it sent out now.
I have give him until 9/9/13 to get the Physician's Statement turned back into us. Feel free to check up on his status. I will notify you when Cathy makes a determination about his Physician's Statement. Let me know if you have any questions during this process.

Thank you,

**Suzanne Moore**
Benefits Administrator
423.643.3415

**From:** McCurry, Edith
**Sent:** Thursday, August 22, 2013 5:10 PM
**To:** Moore, Suzanne; Phillips, Cathy; Szplett, Len
**Subject:** RE: Employee Morris Tyson status

Here's what I have for a job description. He's on 1st shift

Thank you

Edith McCurry

Kenco Logistics Services
1125 Sycamore Rd.
Manteno, IL 60950
www.kencogroup.com
Email: Edith.McCurry@KencoGroup.com
Office 815-468-9999, X464
Fax 1-815-468-2468

**From:** Moore, Suzanne
**Sent:** Thursday, August 22, 2013 8:59 AM
**To:** Phillips, Cathy; Szplett, Len
**Cc:** McCurry, Edith
**Subject:** RE: Employee Morris Tyson status



I can certainly set him up using a Medical Personal Leave of Absence which gives the employee 30 days unpaid leave. Throughout our Interactive Process we review Physician's Statements to determine the timeframe we can continue to offer job protected coverage.

Page 2 of 2

423.643.3415

**From:** Phillips, Cathy
**Sent:** Wednesday, August 21, 2013 6:43 PM
**To:** Szplett, Len
**Cc:** McCurry, Edith; Moore, Suzanne
**Subject:** RE: Employee Morris Tyson status

**From:** Szplett, Len
**Sent:** Monday, August 19, 2013 3:19 PM
**To:** Phillips, Cathy
**Cc:** McCurry, Edith
**Subject:** Employee Morris Tyson status

Hello Cathy, we have an employee, one of our spotters, Morris Tyson, who's gone through his 12 weeks of FMLA with the Hartford. He sustained injuries to both his hands and has been off since 5-21-13, I'm inquiring as to what we can do to keep Morris in an unpaid leave category? He has a 1-19-2004 hire date that carried over with him from 4T's to Kenco in the needed spotter position.

Can you advise what our options may be ? We need to advise Morris what his status is with the Kenco company. Since this happenned 30 days after transition to Kenco, he still has his 60 days to complete to qualify for Cigna heath coverage.

Can you please let us know what we can do for him?

Thank you.
Len Szplett
Kenco Logistic Services
Mars-Manteno DFC#US24
815-468-4488



KENCO
An Equal Opportunity Employer
Job Posting

KENCO is a supply chain solutions provider headquartered in Chattanooga, TN. Established in 1950, the company operates more than 29 million square feet of warehouse space and employs over 3,600 people in 25 states and Canada. KENCO has served customers such as Honeywell, Whirlpool, and Electrolux for over 60 years.

## Current Position Available

**Job Title:** Yard Spotter - Mars
**Location:** Manteno, IL

### About the Opportunity

The yard spotter is responsible for safe and efficient movement of trailers in the yard, and following all standard operating procedures.

### About the Position

- Ensure that yard equipment is in good working order and safe to operate on a daily basis
- Performs and documents daily pre-trip and post-trip inspections on yard tractor
- Operates all equipment in a safe manner, observing all traffic regulations
- Accountable for all assigned tools and equipment
- Reports any accidents, unsafe conditions, injury or damage to management
- Utilizes YMS to make inbound and outbound trailer movements. Prioritizes movements to ensure no down time for warehouse associates
- Safely backs various size trailers into assigned dock spaces, and chocks all trailers
- Safely parks trailers on the warehouse yard
- Completes all system and manual reports log accurately and in a timely manner
- Miscellaneous tasks as assigned by management
- Warehouse responsibilities as assigned by management

### Qualifications

- Must have a valid Class A CDL
- Must pass DOT physical, drug screen and background check
- Must be able to slide trailer tandems alone
- Available to work flexible hours
- Ability to mount and dismount yard tractor frequently and safely
- Willing to work in inclement weather, if necessary
- Safe driving record in the past three year

### Education/Relevant Experience

- High School diploma or equivalent is desired
- A minimum of two years verifiable driving experience
- A minimum of six months related experience or training in a distribution environment preferred

### Additional Skills

- Must have excellent communication, interpersonal and basic math skills
- Must have basic computer skills
- Ability to speak effectively before groups, customers or employees of the organization
- Ability to interpret a variety of instructions furnished in written, oral, diagram or schedule form



EXHIBIT



## Physical Demands

The physical demands described are representative of those that must be met by an employee to successfully perform the essential functions of this job. Reasonable accommodations may be made to enable individuals with disabilities to perform the essential functions.

While performing the duties of this job, the employee is regularly required to sit, use hands to handle or feel, and reach with hands and arms. The employee must occasionally lift and/or move up to 75 pounds. Specific vision abilities required by this job include close vision, distance vision and ability to adjust focus.

## Work Environment

The work environment characteristics described are representative of those an employee encounters while performing the essential functions of this job. Reasonable accommodations may be made to enable individuals with disabilities to perform the essential functions.

While performing the duties of this job, the employee is occasionally exposed to fumes or airborne particles, extreme cold, extreme heat and dust.

The noise level in the work environment is usually moderate to loud.